# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

THE LANE CONSTRUCTION CORPORATION,

*Plaintiff, Counter-Defendant, Appellant,*

v.

SKANSKA USA CIVIL SOUTHEAST, INC.;
GRANITE CONSTRUCTION COMPANY,

*Defendants, Counter-Claimants, Appellees*,

v.

WEBUILD S.P.A., INC.

*Counter-Defendant, Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida,
No. 6:21-cv-00164-RBD, Hon. Roy B. Dalton, Jr.

## OPENING BRIEF OF APPELLANTS THE LANE CONSTRUCTION CORPORATION AND WEBUILD S.P.A., INC.

Michael S. McNamara
Gerald Zingone
Shelby L. Dyl
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
1200 Seventeenth St., N.W.
Washington, D.C. 20036
Phone: (202) 663-9010
michael.mcnamara@pillsburylaw.com
gerald.zingone@pillsburylaw.com
shelby.dyl@pillsburylaw.com

David C. Frederick
Kelley C. Schiffman
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dfrederick@kellogghansen.com
kschiffman@kellogghansen.com

*Counsel for Appellants The Lane Construction Corporation and Webuild S.p.A. Inc.*

October 23, 2024

## CORPORATE DISCLOSURE STATEMENTS

Lane Industries, Inc. is the parent company of The Lane Construction Corporation. Lane Industries, Inc. is wholly owned by Webuild US Holdings, Inc., which is wholly owned by Webuild S.p.A., an Italian corporation ("WBD.MI"). No publicly held company owns 10% or more of stock in The Lane Construction Corporation. Webuild S.p.A. Inc. has no parent company, and no publicly held company owns 10% or more of its stock.

## CERTIFICATE OF INTERESTED PERSONS

Under Eleventh Circuit Rules 26.1-1 and 26.1-2, undersigned counsel for Plaintiff-Appellant The Lane Construction Corporation and Defendant-Appellant Webuild S.p.A., Inc. certify that the following is a full and complete list of all persons and other legal entities having an interest in the outcome of this case:

1. Alston & Bird LLP, Attorney for Skanska-Granite-Lane

2. Baker & Hostetler LLP, Attorney for Plaintiff-Appellant

3. Brodsky, Jerry P., Attorney for Defendant-Appellee Skanska USA Civil Southeast, Inc.

4. Chin, Kesang S., Attorney for Defendant-Appellee Skanska USA Civil Southeast, Inc.

5. Dalton, Jr., Roy B., U.S. District Judge for the Middle District of Florida

6. Dyl, Shelby L., Attorney for Plaintiff-Appellant and Defendant-Appellant

7.     Fombrun, Charles E., Attorney for Defendant-Appellee Skanska USA Civil

Southeast, Inc.

8.     Frederick, David C., Attorney for Plaintiff-Appellant and Defendant-

Appellant

9.     Friedman, Warren E., Attorney for Defendant-Appellee Skanska USA Civil

Southeast, Inc.

10.    Gans, Jeffrey, Attorney for Plaintiff-Appellant and Defendant-Appellant

11.    Granite Construction Company, Defendant-Appellee

12.    Granite Construction, Inc. ("GVA")

13.    Hanover, John, Attorney for Skanska-Granite-Lane

14.    Henner & Scarbrough, LLP, Attorney for Defendant-Appellee Granite

Construction Company

15.    Henner, Joseph, Attorney for Defendant-Appellee Granite Construction

Company

16.    Hoogstraten, Nick R., Attorney for Defendant-Appellee Skanska USA Civil

Southeast, Inc.

17.    Hornreich, Michael A., Attorney for Skanska-Granite-Lane

18.    Irick, Daniel C., U.S. Magistrate Judge for the Middle District of Florida

19.    Kapetanovic, Kathleen, Attorney for Defendant-Appellee Granite

Construction Company

20.   Kellogg, Hansen, Todd, Figel, & Frederick PLLC, Attorney for Plaintiff-Appellant and Defendant-Appellant

21.   Lane Industries, Inc. (parent corporation of Plaintiff-Appellant)

22.   McLean, Hannah, Attorney for Skanska-Granite-Lane

23.   McNamara, Michael S., Attorney for Plaintiff-Appellant and Defendant-Appellant

24.   Meller, Bruce D., Attorney for Defendant-Appellee Skanska USA Civil Southeast, Inc.

25.   Okwara, Arabella, Attorney for Skanska-Granite-Lane

26.   Olsen, Christopher J., Attorney for Defendant-Appellee Granite Construction Company

27.   Peckar & Abramson, P.C., Attorney for Defendant-Appellee Skanska USA Civil Southeast Inc.

28.   Pillsbury Winthrop Shaw Pittman, LLP, Attorney for Plaintiff-Appellant and Defendant-Appellant

29.   Scarbrough, Tyler, Attorney for Defendant-Appellee Granite Construction Company

30.   Schiffman, Kelley, Attorney for Plaintiff-Appellant and Defendant-Appellant

31.   Shanlever, Michael H., Attorney for Defendant-Appellee Skanska USA Civil Southeast, Inc.

32. Skanska AB, a Swedish corporation ("SKA-B.ST")

33. Skanska USA Civil Southeast, Inc., Defendant-Appellee

34. Skanska USA Inc.

35. Skanska-Granite-Lane, a Joint Venture

36. Stein, Gary M., Attorney for Defendant-Appellee Skanska USA Civil Southeast, Inc.

37. The Lane Construction Corporation, Plaintiff-Appellant

38. Thielhelm, Jr., Robert W., Attorney for Plaintiff-Appellant and Defendant-Appellant

39. Webuild S.p.A., an Italian corporation ("WBD.MI"), Defendant-Appellant (whole owner of Webuild US Holdings, Inc.)

40. Webuild US Holdings, Inc. (whole owner of Lane Industries, Inc.)

41. Weinberg Wheeler Hudgens, Gunn & Dial, LLC, Attorney Skanska-Granite-Lane

42. Zingone, Gerald, Attorney for Plaintiff-Appellant and Defendant-Appellant

Dated:  October 23, 2024

*/s/ David C. Frederick*

David C. Frederick

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument. This case involves an extensive factual record, key disputes of material fact, and complex legal issues, including the standard for breach of the duty of loyalty under the Florida Revised Uniform Partnership Act. Appellants believe that this Court's decisional process will be significantly aided by oral argument. *See* Fed. R. App. P. 34(a)(2); 11th Cir. R. 34-3(b).

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ......................................................C-1

CERTIFICATE OF INTERESTED PERSONS....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF AUTHORITIES...................................................................................v

JURISDICTIONAL STATEMENT ........................................................................x

INTRODUCTION ..................................................................................................1

STATEMENT OF THE ISSUES ............................................................................3

STATEMENT OF THE CASE................................................................................4

I.      Statement Of Facts...........................................................................................4

      A.     The Construction Project And The Parties.............................................4

      B.     Skanska AB's Ownership Interest In I4MP And SGL .........................5

      C.     The Joint Venture Agreement ................................................................5

      D.     The Project Delays And Massive Losses ...............................................6

      E.     SGL's "Equivalent Claim" Rights .........................................................7

            1.     SGL's right to send I4MP an equivalent claim notice
                 demanding that I4MP request termination from FDOT .............7

            2.     Using an equivalent claim notice to create leverage
                 because of I4MP's and SGL's divergent interests.....................8

      F.     Skanska SE's Conflict Of Interest........................................................11

            1.     The conflict and the October 9 meeting....................................11

            2.     The conflict and the October 19 meeting..................................13

      G.     Settlement Negotiations With FDOT .................................................14

H.    SGL's Rules Regarding Working Capital Calls ....................................16

I.    Working Capital Call Dispute ...........................................................18

II.    Procedural History ..................................................................................21

A.    Summary Judgment ............................................................................22

B.    Post-Trial Findings of Fact ................................................................23

C.    Post-Trial Conclusions of Law ..........................................................24

D.    Damages And Prejudgment Interest ..................................................25

SUMMARY OF ARGUMENT ..................................................................................25

STANDARD OF REVIEW ......................................................................................28

ARGUMENT ...........................................................................................................29

I.    The District Court Erred In Ruling That Skanska SE Did Not
Breach Its Fiduciary Duties ....................................................................29

A.    FRUPA Strictly Prohibits Conducting Joint Venture Business
While "Having An Interest Adverse To" The Joint Venture ..............30

1.    Under FRUPA's plain text, conducting business with
a conflict of interest is a breach of fiduciary duty ...................30

2.    Official commentary further clarifies that FRUPA's
prohibition is absolute and lacks a fairness defense ................31

B.    The District Court Applied The Incorrect Standard When
Assessing Skanska SE's Breach Of Fiduciary Duty ..........................33

C.    Under The Correct Standard, Skanska SE Breached Its Fiduciary
Duties To Lane ...................................................................................34

II.    The District Court Erred In Finding No Available Remedy For
Skanska SE's Breach Of Fiduciary Duty ................................................37

A.    Flexible Remedies Are Available For A Breach Of
Fiduciary Duty ...................................................................................38

B.   The District Court Clearly Erred In Finding Lane Was Not
     Entitled To Compensatory Damages .................................................39

C.   The District Court Erred In Disregarding Equitable Remedies ..........43

     1.   Disgorgement of Skanska's ill-gotten gains is appropriate ......44

     2.   Skanska SE's breach merits shifting attorneys' fees ...............45

     3.   A denial of prejudgment interest is warranted .........................46

     4.   Nominal damages and a declaratory judgment are appropriate46

     5.   The ongoing partnership justifies injunctive relief .................47

III.   The District Court Committed Multiple Reversible Errors In
       Granting Summary Judgment On Appellees' Breach Of Contract And
       Indemnification Claims ................................................................................48

A.   The District Court Ignored A Material Dispute Of Fact Over The
     Validity Of The Working Capital Requests .........................................49

B.   The District Court Erred In Deciding Summary Judgment
     On A Sua Sponte Ground Without Notice And In Conflict With
     The Record .........................................................................................51

     1.   The court issued its sua sponte ruling without notice ...............52

     2.   The court's sua sponte ruling is contrary to the record ............53

C.   The District Court Misinterpreted The JVA In Concluding
     Lane Had To Pay The Capital Calls While Disputing Their
     Validity ..............................................................................................54

D.   Appellees Are Not Entitled To Prejudgment Interest ..........................56

CONCLUSION .............................................................................................................57

CERTIFICATE OF COMPLIANCE .........................................................................59

CERTIFICATE OF SERVICE ...................................................................................60

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Alloy v. Wills Fam. Tr.*,
  944 A.2d 1234 (Md. Ct. Spec. App. 2008) ........................................... 34, 47

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
  432 F. Supp. 2d 1319 (S.D. Fla. 2006),
  *aff'd*, 294 F. App'x 501 (11th Cir. 2008) ........................................ 39, 40, 42

*Arizona Chem. Co. v. Mohawk Indus.*,
  197 So. 3d 99 (Fla. DCA 2016) ................................................... 46

*Bailey v. St. Louis*,
  268 So. 3d 197 (Fla. DCA 2018) ................................................. 44

*Blasland, Bouck & Lee, Inc. v. City of N. Miami*,
  283 F.3d 1286 (11th Cir. 2002) .................................................. 46

*Britt Green Trucking, Inc. v. FedEx Nat'l, LTL, Inc.*,
  2014 WL 3417569 (M.D. Fla.) .................................................. 38

*Byars v. Coca-Cola Co.*,
  517 F.3d 1256 (11th Cir. 2008) .................................................. 52

*Carolina Pres. Partners, Inc. v. Wolf Arbin Weinhold*,
  414 B.R. 754 (M.D. Fla. 2009) .................................................. 35

*CFTC v. Southern Tr. Metals, Inc.*,
  894 F.3d 1313 (11th Cir. 2018) .................................................. 28

*D. H. Pace Co. v. Aaron Overhead Door Atlanta LLC*,
  2021 WL 2819778 (N.D. Ga.) ................................................. 46, 47

*Donahue v. Davis*,
  68 So. 2d 163 (Fla. 1953) ....................................................... 29

*Global Energies, LLC, In re*,
  763 F.3d 1341 (11th Cir. 2014) .................................................. 44

*Graham v. Texas Gulf Sulphur Co.*,
  457 F.2d 418 (5th Cir. 1972) .......................................................... 54

*Gratz v. Claughton*,
  187 F.2d 46 (2d Cir. 1951) .............................................................. 39

*Harvard v. Walton*,
  257 S.E.2d 280 (Ga. 1979) ....................................................... 47, 48

*Horne v. Aune*,
  121 P.3d 1227 (Wash. Ct. App. 2005) ......................................... 45

*Imaging Bus. Machs., LLC v. BancTec, Inc.*,
  459 F.3d 1186 (11th Cir. 2006) ..................................................... 52

*James River Ins. v. Rich Bon Corp.*,
  34 F.4th 1054 (11th Cir. 2022) ..................................................... 47

*Karlson v. Red Door Homes, LLC*,
  553 F. App'x 875 (11th Cir. 2014) ................................................ 52

*Kel Homes, LLC v. Burris*,
  933 So. 2d 699 (Fla. 2d DCA 2006) .............................................. 57

*King Mountain Condo. Ass'n, Inc. v. Gundlach*,
  425 So. 2d 569 (Fla. DCA 1982) ................................................... 44

*Knowles v. Hart*,
  825 F. App'x 646 (11th Cir. 2020) ................................................ 53

*Land & Sea Petrol. Holdings, Inc. v. Leavitt*,
  321 So. 3d 810 (Fla. DCA 2021) ................................................... 47

*Larmoyeux v. Montgomery*,
  963 So. 2d 813 (Fla. DCA 2007) ................................................... 45

*Lopez v. Hall*,
  233 So. 3d 451 (Fla. 2018) ............................................................ 30

*Manning ex rel. Manning v. School Bd. of Hillsborough Cnty.*,
  244 F.3d 927 (11th Cir. 2001) ................................... 28, 29, 37, 40

*Meinhard v. Salmon,
   164 N.E. 545 (1928) ................................................................ 29

McCarthy v. Estate of Krohn,
   16 So. 3d 193 (Fla. DCA 2009) ................................................ 29

Northeast Nat. Energy LLC v. Pachira Energy LLC,
   844 S.E.2d 133 (W.Va. 2020) .................................................. 48

Pizarro v. Home Depot, Inc.,
   111 F.4th 1165 (11th Cir. 2024) .............................................. 28

PODS Enters., LLC v. U-Haul Int'l Inc.,
   126 F. Supp. 3d 1263 (M.D. Fla. 2015) .................................... 46

Quinn v. Phipps,
   113 So. 419 (1927) .................................................................. 38

Robinson v. Shell Oil Co.,
   519 U.S. 337 (1997) ................................................................ 31

Saeme v. Levine,
   2012 WL 13134605 (S.D. Fla.) ............................................... 43

SEC v. Monterosso,
   557 F. App'x 917 (11th Cir. 2014) ..................................... 44, 45

Serendipity at Sea, LLC v. Underwriters at Lloyd's of London,
   56 F.4th 1280 (11th Cir. 2023) ............................................... 51

Sheridan Healthcorp, Inc. v. Amko,
   993 So. 2d 167 (Fla. DCA 2008) ............................................. 30

Shire v. Unknown/Undiscovered Heirs,
   907 N.W.2d 263 (Neb. 2018) .................................................. 31

Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.,
   394 S.W.3d 186 (Tex. Ct. App. 2012) ..................................... 47

Stevens v. Cricket Club Condo., Inc.,
   784 So. 2d 517 (Fla. DCA 2001) ............................................. 46

*Storfer v. Guarantee Tr. Life Ins. Co.*,
666 F.3d 1277 (11th Cir. 2012) ..................................................... 38

*Twyman v. Roell*,
166 So. 215 (Fla. 1936) ................................................................ 38

*United States v. DBB, Inc.*,
180 F.3d 1277 (11th Cir. 1999) ..................................................... 30

*Williams v. Stanford*,
977 So. 2d 722 (Fla. DCA 2008) .................................................. 33

*Woods v. City Nat'l Bank & Tr. Co.*,
312 U.S. 262 (1941) ................................................................. 36, 39

*Yale Univ. v. Blumenthal*,
621 A.2d 1304 (Conn. 1993) ........................................................ 31

**STATUTES**

Florida Revised Uniform Partnership Act, Fla. Stat. § 620.81001 *et seq*. .............. 29

§ 620.8403(3)(a)-(b) .................................................................... 30

§ 620.8403(3)(a) ......................................................................... 34

§ 620.8403(3)(b) ......................................................................... 34

§ 620.8404 ................................................................................. 30

§ 620.8404(1) ............................................................................. 30

§ 620.8404(2)(b) ............................. 25, 29, 30, 31, 33, 34, 36, 37

§ 620.8405(2) ........................................................................ 38, 45

Harmonized Uniform Partnership Act § 409(b)(2) (2013) .............................. 32, 34

Revised Uniform Partnership Act § 404(b)(2) (1997) ........................................... 31

Fla. Stat. § 607.0831(3)(b) ..................................................................... 31

**RULES**

Fed. R. Civ. P.:

Rule 52(a) ........................................................................ 28, 37, 40

Rule 56(f) ...................................................................................... 52

**OTHER MATERIALS**

Black's Law Dictionary (12th ed. 2024) ................................................ 34

Samuel Bray, "Fiduciary Remedies," *in*
*The Oxford Handbook of Fiduciary Law* (2019)......................... 43

J. William Callison & Maureen A. Sullivan,
*Partnership Law and Practice* (2024)......................................... 30

Christine Hurt et al., *Bromberg and Ribstein on Limited Liability*
*Partnerships, The Revised Uniform Partnership At, and the*
*Uniform Limited Partnership Act* (2001) ...................................... 32

Litig. Release, *SEC Charges Infrastructure Company*
*Granite Construction*, U.S. Sec. & Exch. Comm'n
(Sept. 15, 2022), https://www.sec.gov/enforcement-litigation/litigation-
releases/lr-25507 .......................................................................... 10

Restatement (Second) of Agency (1958) .................................. 31, 32, 44

Restatement (Third) of Restitution and Unjust Enrichment (2011) ...................... 44

Julian Velasco, "Fiduciary Principles in Corporate Law,"
*in The Oxford Handbook of Fiduciary Law* (2018)...................... 33

# JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over Lane's[1] claims against Skanska SE under 28 U.S.C. § 1332 because the Parties are citizens of Connecticut and Virginia and the amount in controversy exceeds $75,000, exclusive of interest and costs. The district court had supplemental jurisdiction under 28 U.S.C. § 1367 over the counterclaims Skanska SE and Granite brought against Lane and Webuild.

This appeal challenges the district court's summary judgment for Skanska SE and Granite on their claims for breach of contract, indemnification, and guarantee; and the final judgment for Skanska SE and Granite on damages, and against Lane on its breach-of-fiduciary-duty claim. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] The relevant involved entities are Lane Construction Corp. ("Lane"), Skanska USA Civil Southeast, Inc. ("Skanska SE"), Granite Construction Company ("Granite"), Skanska-Granite-Lane ("SGL"), I-4 Mobility Partners OpCo LLC ("I4MP"), Skanska Infrastructure Development, Inc. ("Skanska ID"), Skanska USA, Inc. ("Skanska USA"), Skanska AB, a Swedish corporation ("Skanska AB"), Webuild S.p.A Inc. ("Webuild"), and the Florida Department of Transportation ("FDOT").

# INTRODUCTION

This case involves a dispute among three joint venture members over the managing partner's conflict of interest. Skanska SE and Granite formed a joint venture with Lane (collectively, "SGL") to improve the I-4 highway in Florida along with its business partner, I4MP. SGL was responsible for constructing the improvements (with a $2.3 billion budget) and I4MP was responsible for financing it (in exchange for post-construction highway revenues). As SGL faced delays and massive financial losses, the joint venturers explored how best to reach an accommodation with I4MP and FDOT.

A significant conflict of interest interfered. Parent-company Skanska AB had an interest in both aspects of the Project: it owns both Skanska SE and Skanska ID, which owns half of I4MP. This "dual interest" became an issue as SGL faced massive mounting losses. SGL needed leverage to negotiate more funds from both I4MP and FDOT. To create that leverage, SGL considered exercising its contractual right to demand that I4MP seek termination of its FDOT obligations. Skanska SE's conflict of interest, however, made that negotiating plan impossible. The interests of Skanska SE simply could not be pitted against the more lucrative interests of Skanska AB, which stood to gain far more from I4MP's revenues than Skanska SE would lose from SGL being forced to construct the Project at a loss. While Lane repeatedly objected to this conflict of interest, Skanska SE never took

steps to address it. Instead, Skanska SE advocated against exercising SGL's right to demand that I4MP seek termination, which deprived Lane and SGL of their right to a detached decision-making process. Without leverage, SGL's projected losses exceeded $500 million by trial.

This appeal concerns whether Skanska SE's conflict of interest supports a claim for breach of fiduciary duty under Florida's Revised Uniform Partnership Act ("FRUPA") and whether Lane breached its Joint Venture Agreement with Skanska SE and Granite.

The district court erred by never analyzing whether Skanska SE had a conflict of interest. Instead, it ruled there was no breach of fiduciary duty and no remedy because Skanska SE's opposition—even if conflicted—was in Lane's "best interest." This approach directly conflicts with FRUPA's strict, no-conflicts rule and effectively licenses Skanska SE's breach. The court also awarded Skanska SE and Granite roughly $80 million in damages on unpaid capital calls after it misconstrued the Joint Venture Agreement and ignored Lane's evidence that the calls were invalid. Both errors warrant reversal. A remand on the proper remedy for Skanska SE's breach of fiduciary duty is warranted.

## STATEMENT OF THE ISSUES

**1.** Whether the district court erred in finding that a minority partner has no remedy when a majority partner's conflict of interest compromises the decision-making process over an important business decision because the minority partner cannot prove "exactly what would have happened" absent the conflict of interest.

**2.** Whether the district court erred in granting summary judgment to Appellees on their claim that Lane breached a contractual obligation to pay working capital calls when it ignored a material dispute of fact over the validity of those calls and instead—sua sponte and without notice—relied upon a contractual interpretation at odds with the unambiguous language of the Parties' Joint Venture Agreement and the undisputed record.

# STATEMENT OF THE CASE

## I.    Statement Of Facts

### A.    The Construction Project And The Parties

In 2013, the Florida Department of Transportation ("FDOT") announced a six-year expansion of the I-4 highway (the "Project"). JA1038, JA2065. The Project involved converting the six-lane highway into a 12-lane highway with four express toll lanes and overhauling or constructing 15 interchanges, 74 bridges, and numerous cross-roads, frontage roads, and ramps. JA656, JA2065, JA2687.

FDOT financed the Project through a public-private partnership in which FDOT owns the highway and provides roughly half the Project funding, with a private concessionaire financing the remainder and overseeing construction. JA658, JA2683. After a public bidding process, FDOT selected a $2.3 billion bid from a team consisting of I4MP, as concessionaire, and a joint venture of three construction companies, called Skanska-Granite-Lane ("SGL"), to build the Project. JA2065, JA2687-2688. The budget included $2.067 billion for SGL's construction costs and roughly $255 million in estimated profits for SGL. JA1038, JA2694, JA2707-2711. On September 4, 2014, FDOT and I4MP entered into the Concession Agreement, which grants I4MP a 40-year contract—valued at $75 million per year—to operate and maintain the highway. JA655, JA1038, JA2050, JA2683, JA2692-2693. That same day, I4MP and SGL entered into the Design-

4

Build Agreement, which requires SGL to construct the Project for $2.3 billion. JA1038, JA1172.[2]

## B. Skanska AB's Ownership Interest In I4MP And SGL

I4MP is jointly owned by Skanska ID and John Laing Investments Ltd. JA1038. Skanska ID is owned by Skanska AB, a publicly traded Swedish company. JA3425.

SGL is an unincorporated joint venture composed of three companies: Appellant Lane,[3] Appellee Granite, and Appellee Skanska SE. JA1036-1037. Skanska SE is the majority partner with a 40% share; Lane and Granite each have 30% shares. JA1094-1095 (Art. 3.1). Skanska SE is a subsidiary of Skanska USA, which is also ultimately owned by Skanska AB. JA3838. The various Skanska entities—including Skanska SE and Skanska ID—operate under a "One Skanska" ideology, "cooperating as a group to get the best that [they] can out of this company as a whole." JA667.

## C. The Joint Venture Agreement

SGL is governed by the Joint Venture Agreement ("JVA"). It provides for profits and losses to be split among the members, according to their proportionate

---

[2] The Project also involved a "design team" that is not part of this litigation. JA2688.

[3] Appellant Webuild is the parent company and guarantor of Lane. JA1017.

shares in the joint venture. JA1094-1095 (Arts. 3.1-3.2). An Executive Committee consisting of one representative from each member runs SGL. JA1096 (Art. 4.1). "Decisions of the Executive Committee and decisions of the Parties must be unanimous." JA1096 (Art. 4.3).

### D. The Project Delays And Massive Losses

Construction began in 2015 and was supposed to end in 2021. JA2695. By 2018, however, SGL forecast that it was eight months behind schedule, would lose over $100 million on the Project, and could face liquidated damages if it completed the Project late. JA1229, JA2713. By the time of trial, SGL's projected losses had grown to $500 million. JA2938.

Several factors contributed to the delay, including an economic downturn, Hurricane Irma, and Project additions. JA1039, JA4021. But trial evidence showed the biggest source of delay related to "drilled shafts." JA2723. Lane's former CEO, Robert Alger, testified that SGL was drilling shafts for a "critical" bridge when it hit massive "sinkholes." JA2723. Thus, "the original design had been changed to a different design," driving up costs and delays. JA2723.

In June 2018, the joint venture, through I4MP, submitted its drilled shaft claim to FDOT requesting recovery of $98 million, to be roughly split between SGL and I4MP, and an additional 245 days to complete the Project. JA1039,

JA2241-2244. SGL also submitted other claims to FDOT seeking additional funds. JA2721-2722.

### E. SGL's "Equivalent Claim" Rights

Because SGL was still projected to incur massive losses on the Project—even with its claims—SGL directed outside counsel to analyze the joint venture's "equivalent claim" rights under its contract with I4MP. JA1135, JA2722-2724.

#### 1. SGL's right to send I4MP an equivalent claim notice demanding that I4MP request termination from FDOT

In a May 2018 memorandum, SGL's outside counsel thoroughly described SGL's "equivalent claim" rights under the Design-Build Agreement. JA1135-1139; *see also* JA4645-4646. The memorandum explained two fundamental points.

First, it explained that I4MP has a right under its Concession Agreement to request termination of its obligations to FDOT if Project construction is delayed more than 180 days. JA1136-1137, JA2140 (§ 10.2.2.4), JA2202 (§ 20.1). Upon receiving such a request, FDOT has the option of ending its Agreement with I4MP or maintaining the contract for up to six months (or longer, if the Parties agree) before termination. JA2204 (§ 20.2.3). The memorandum observed that I4MP's termination right "could likely be triggered [by] the filing of the Drilled Shafts Claim," assuming SGL could prove the requisite delay. JA1136.[4]

---

[4] A subsequent memorandum explained that, if FDOT chose to extend the Project for at least six months, that would trigger a Design-Build Agreement

Second, the memorandum advised that while SGL had no independent right to request termination of the Project for delays exceeding 180 days, SGL's contract with I4MP requires that I4MP exercise its rights "for the benefit of" SGL. JA1135-1139, JA1557. In fact, the Design-Build Agreement gives SGL the right to submit an "equivalent claim notice" demanding that I4MP exercise its right to request termination. JA1135-1139, JA1558 (defining "equivalent claim notice").[5]

### 2. Using an equivalent claim notice to create leverage because of I4MP's and SGL's divergent interests

The May 2018 memorandum explained how SLG's "equivalent claim" rights provided SGL leverage to negotiate compensation from FDOT and/or I4MP to cover forecast losses. Specifically, outside counsel pointed out that "submission of an Equivalent Claim Notice . . . by SGL to I4MP, demanding 14MP terminate the [Concession Agreement], will place I4MP in a very difficult predicament." JA1142. Providing such a notice would leave I4MP only three options: (1) request termination from FDOT, thus ending I4MP's 40-year contract; (2) pay SGL the reasonable value of the requested relief, thus costing I4MP hundreds of millions of

---

provision entitling SGL to additional compensation from I4MP and relief from any liquidated damages obligation. JA1156, JA2203 (§ 20.2.2). If FDOT instead elected immediate termination, FDOT could either release SGL from its contract, and thus any future losses, or choose to "step into I4MP's shoes" and take over the Design-Build Agreement with SGL, which would leave SGL no worse off than before. JA1154, JA1156-1157.

[5] That Lane had this right was never in dispute. JA3738-3802.

dollars; or (3) dispute SGL's notice as defective or frivolous, exposing I4MP to liability to SGL. JA3385-3387; *see also* JA1156-1157.

In a subsequent memorandum, outside counsel again emphasized the divergent interests between SGL and I4MP regarding the equivalent claim rights, pointing out that I4MP would need to pay out of pocket to compensate SGL if it chose not to ask FDOT for termination. JA1152-1155. Both memoranda concluded that SGL could use an equivalent claim notice as "leverage" because the "unfavorable position" it would create for I4MP "may be beneficial to SGL in its coming negotiations" with I4MP and FDOT. JA1142, JA1154.

Lane's trial witnesses confirmed that SGL's equivalent claim rights were to be used as a negotiation tactic. Alger testified he thought an equivalent claim notice was a "negotiating tool." JA2743. "We submit the [notice] to 14MP . . . and then that would allow us the opportunity to have a position of strength at least. . . . [W]e could go in and start to negotiate something with [I4MP], because right now we're living our worst nightmare." JA2749; *see also* JA2756-2757. Lane's then-CEO, Ignacio Botella, similarly testified he viewed an equivalent claim notice as "the best leverage" to possibly "renegotiate the contract either with

I4MP as concessionaire [or] FDOT as owner," to minimize SGL's losses. JA2903-2905.[6] No Granite representative testified about the strategy.[7]

Outside counsel's memoranda did warn the strategy presented risks. It could be difficult to prove a 180-day qualifying delay while the drilled shaft claim remained pending, and pursuing the strategy might cause "protracted litigation" or prompt FDOT to treat the drilled shaft claim unfavorably. JA1132-1133, JA1136-1137, JA1154-1155. Despite these uncertainties, Lane viewed an equivalent claim notice as its only leverage. As Lane's outside counsel explained in 2018, the termination option was the "best opportunity for SGL to avoid the losses it is projected to incur through completion of the project," especially because "continuing to perform without forcing some type of action on the part of I4MP and FDOT will surely result in significant financial losses to SGL." JA4650.

---

[6] The court refused to hear evidence that both Lane and Skanska SE had invoked termination rights in other projects. JA2898-2899, JA3635-3636.

[7] During this litigation, Granite faced a shareholder lawsuit and SEC investigation for misrepresenting significant losses, including in the I-4 Project. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. 3:19-cv-04744-WHA (N.D. Cal); Litig. Release, *SEC Charges Infrastructure Company Granite Construction*, U.S. Sec. & Exch. Comm'n (Sept. 15, 2022), https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25507.

### F.   Skanska SE's Conflict Of Interest

Initially, all three joint venture members expressed interest in using an equivalent claim notice as leverage,[8] with Skanska SE's and Granite's counsel elevating the idea to SGL's Executive Committee in May 2018. JA2338 n.2. That interest caused SGL to seek further legal advice, resulting in the August 2018 memorandum, JA1152, and to discuss the strategy at a scheduled October 9, 2018 meeting. JA2748-2749.

### 1.   The conflict and the October 9 meeting

Richard Kennedy, President and CEO of parent-company Skanska USA, testified that Skanska SE needed to consult him in all major decisions, and that he "injected [himself] into [SGL's] October 9th meeting," where he announced that Skanska SE opposed sending an equivalent claim notice. JA2248, JA3851, JA3910. The official notes reflected that Lane's former CEO, Alger, immediately objected that there was a conflict of interest because both Skanska SE and Skanska ID are ultimately owned by Skanska AB. JA2250.

Alger testified that at this meeting "it started to hit home with me that we've got a real problem here." JA2760. He saw the conflict of interest as a matter of

---

[8] The Parties colloquially referred to sending an equivalent claim notice as the "termination option." As Botella explained at trial, however, "[w]hen we say termination option, we understood . . . SGL sending to I4MP the request to send some notice to FDOT." JA2910.

arithmetic: Skanska ID was poised to gain more from continuing with the Project than Skanska SE was set to lose. JA2760. In contrast, both "Lane and Granite were going to lose $160 million on the construction agreement" and had "no recourse because [they are] not in the concession." JA2760. Lane's expert, Kevin Dennis, confirmed that the Skanska entities had a financial incentive to oppose termination because any losses suffered by Skanska SE through SGL would be recouped by the $527 million that Skanska ID stood to gain from I4MP's extended contract with FDOT. JA2989-2990, JA2995.

At the October 9 meeting, Kennedy admitted "that Skanska h[as] a dual stake in the project," claiming this was "a strength" because it ensured "that the interests of all parties involved would be pursued to the fullest." JA2250. At trial, Kennedy acknowledged Skanska ID and Skanska SE had divergent interests: "I4MP, as the concessionaire, has one interest with respect to [whether to send an equivalent claim notice], and SGL has its interest with respect to that issue, and they're different." JA3902. Kennedy also affirmed that "Skanska never erected anything like a firewall between [Skanska SE] and [Skanska ID]." JA3909. Stephen Lunsford, Skanska SE's in-house counsel, similarly testified that consideration of whether SGL should send the notice could result in "potentially an adverse position" between Skanska ID and Skanska SE, and if SGL submitted the notice, their interests "would be adverse" "[b]y definition" because the notice

"would have triggered some type of dispute" between SGL and I4MP. JA3427-3428.

### 2.    The conflict and the October 19 meeting

Kennedy further testified that he attended a follow-up SGL meeting on October 19, 2018, as the "senior-most executive for Skanska" and once again made clear that Skanska did not support sending an equivalent claim notice to I4MP. JA3917. Botella, then Webuild's Deputy General Manager,[9] testified he challenged Kennedy at the meeting, arguing that sending the notice was "the best leverage" they had to get both I4MP and FDOT to negotiate. JA2904. When Kennedy suggested FDOT might view any suggestion that I4MP invoke its termination right as a threat, Botella responded that "exercise of a contractor's right in [a] negotiated and agreed contract among those two parties cannot be considered . . . a threat because . . . that's what . . . happen[s] in the construction business." JA2907. When Kennedy argued that I4MP exercising its termination right could cause I4MP reputational damage, Botella responded that I4MP was under no obligation to request termination and could instead choose to negotiate with SGL in response to an equivalent claim notice. JA2907. To insist otherwise, he said, is "protecting the concessionaire against the substantial right that SGL has. So you have a clear conflict of interest." JA2907. "Kennedy didn't respond." JA2907. SGL did not

---

[9] At the time, Webuild was known as Salini Impregilo. JA2890-2891.

reach a final decision on the equivalent claim notice issue, but Kennedy testified that "the main focus of the parties" subsequently shifted to negotiating with FDOT over the outstanding claims. JA3874.

Lane also introduced emails illustrating improper influence over SGL decision-making. An October 28, 2018 email between I4MP management spoke of working with Skanska SE's in-house counsel to "bring[] common sense to SGL and have him kill this termination thought." JA2350. Another email from Skanska ID management assured I4MP that the issue had "died down" and "no one will formally raise SGL termination." JA4554. A further email from Skanska AB's CFO to Kennedy directed him to "work around this [termination] issue with also I4MP's undertaking in mind." JA3930. Skanska SE executive Don Fusco testified that by January 2019 the issue was "put on the back burner or even dead." JA3182.

### G.    Settlement Negotiations With FDOT

Meanwhile, negotiations with FDOT over the drilled shaft claim and other claims continued. SGL's goal was a "global reset" to get Project losses "back to zero" because the individual claims that had been submitted "did not equate to [the substantial losses] being experienced from the project." JA3148, JA3704-3705.

Fusco, who led the negotiations, testified that rather than negotiate with I4MP or include I4MP in "these global reset negotiations," he negotiated exclusively with FDOT and never asked I4MP to put more money into the Project.

JA3604, JA3613. Fusco acknowledged that changes in conditions, like the one presented by the drilled shaft claim, are often grounds for renegotiations in the construction industry. JA3608-3609.

Fusco also testified that, in his negotiations with FDOT, he made several attempts to get the Florida Secretary of Transportation's attention, but those efforts were rebuffed. JA3605-3606. Instead, he was directed to negotiate "with the district leadership." JA3605. Nonetheless, Fusco continued to tell SGL he thought an offer of $375 million to settle all outstanding claims was viable. JA2263.

As negotiations continued, Lane again raised the conflict of interest with Fusco: "[W]e continue to be concerned that [Skanska SE] has a conflict of interest because of the involv[e]ment of [Skanska ID]" and that "[t]o comply with its fiduciary duty and to support any claim that there is not a conflict of interest, we ask Skanska to disclose to the members of SGL how much Skanska stands to lose if the Project is cancelled." JA2277-2278. Fusco testified Skanska SE never provided the requested disclosures to Lane. JA3633.

In January 2020, FDOT's district leadership made a final offer to settle the drilled shaft claim and several others for $125 million,[10] rejecting SGL's last

---

[10] The settlement also included a one-year extension, mitigation of liquidated damages for any delays, and the ability to seek a future "cumulative impact claim" to request further recovery up to $368 million for other issues. JA4632.

counter-request for roughly three times that amount. JA1022, JA3520. The settlement included a waiver that precluded any future termination based upon the delay in the drilled shaft claim. JA2931-2932. Botella testified that Lane objected to the settlement as not "in the best interest [of] SGL." JA2932. Lane ultimately executed the settlement agreement only after Skanska SE directed it to do so, pursuant to its authority as managing party, and after securing a reservation of rights. JA2352, JA2455, JA2933-2934. Skanska SE and Granite also signed the settlement. JA1040-1041.

On January 22, 2021, Lane brought this lawsuit, alleging that Skanska SE had breached its fiduciary duties to the joint venture through its conflict of interest and interference with fair consideration of submitting an equivalent claim notice. JA60. Lane sought, *inter alia*, a "[d]eclaration that Skanska breached its fiduciary duties," attorneys' fees, and "equitable relief" including "restitution and disgorgement" as well as "such other and further relief as the Court deems just and appropriate." JA79-80.

## H.   SGL's Rules Regarding Working Capital Calls

The JVA provides that members of the joint venture may be called on to make certain "cash contributions" to the Project when needed "to reasonably and necessarily meet its financial requirements." JA1099 (Art. 7.1).

A "working capital call" could be initiated in two ways. First, the Executive Committee could authorize a call "by unanimous vote" recorded in writing. JA1096 (Arts. 4.2, 4.3). Second, absent a unanimous vote, Skanska SE could invoke Article 4.3. That article allows the managing partner—in emergency circumstances and with written notice—to unilaterally impose a working capital call if "it believes approval is critical in order for the Joint Venture to fulfill its obligations under the Contract." JA1096 (Art. 4.3(b)).

Once the managing partner invokes Article 4.3, the dissenting partner can dispute "the need for or the amount of the Working Capital Call." JA1099 (Art. 7.2). That procedure requires "a certified public accountant" to conduct "an independent review . . . to determine if the amount of the Working Capital Call is reasonably required to meet the projected cash requirements." JA1099 (Art. 7.2). The dissenting member must "continue to meet the Working Capital Call requirements" while the dispute resolution is pending. JA1099 (Art. 7.2).

Article 8 governs defaults on working capital calls. If a non-defaulting party pays a defaulting party's call contribution, those payments "shall be deemed to be demand loans" from the non-defaulting party to the defaulting party, which bear interest at a contractually specified rate. JA1100 (Art. 8.2). Further, a defaulting party loses its right "to participate in the management of the Joint Venture, and shall not have any vote on the Executive Committee," but "remain[s] liable for its

*original* Proportionate Share of the losses and liabilities of the Joint Venture and for Working Capital contributions." JA1100 (Art. 8.2(a)-(b)).

More generally, Article 3.2 provides that if "any of the Parties incurs any liabilities or is required to pay any losses in excess of its Proportionate Share, the other Parties shall indemnify, hold harmless and shall reimburse such Party in such amount." JA86 (Art. 3.2). Article 3.2 also provides, however, that if a party has paid more than its proportionate share of capital due to its own "willful misconduct or bad faith," JA86 (Art. 3.2), it is not entitled to compensation for overpayment.

## I.     Working Capital Call Dispute

As Project finances tightened in 2018, SGL began issuing multimillion-dollar working capital calls to the three joint venture members on an almost monthly basis. JA2274-2275. Jose Penalver represented Lane on SGL's Executive Committee, which was responsible for approving these calls. JA885.

In an affidavit, Penalver explained that, once working capital requests became needed, the Executive Committee failed to follow the process for working capital request votes, so Lane created a "Working Capital Request" form to "ensure there was a written record of whether a capital call was unanimously approved by the Executive Committee." JA886. "SGL agreed to use the form" and all three representatives "understood that there was unanimous approval for a working capital call only if all three signatures were obtained" on the form. JA886.

Six months after the form's adoption, Penalver expressed concern that "Skanska continues to end run the formalities of the JVA" when making capital calls. JA886, JA893. The next month, Penalver made clear that "Lane requires these formalities for each and every [call] going forward. Therefore, and so that there is no doubt about Lane's position on the matter, *Lane does not agree to [working capital calls] . . . discussed verbally*." JA887, JA897.

On December 15, 2020, the Executive Committee discussed the possibility of (but did not vote on) issuing another working capital call for January 2021. JA885, JA887-888. Instead, Penalver expressed concern that the requested amount was greater than necessary. JA887.

When supporting financials were circulated later that day via an email titled "January Cash Estimation," Penalver responded: "I review[ed] it and it looks ok to me." JA727. Penalver attested that he meant by this only that he found the call amount appropriate given the financials and would expect to see that amount on a forthcoming working capital call request form. JA889. After Penalver's response, SGL's representative circulated another email titled "SGL Cash Call – Due Jan 11, 2021" asking the representatives to sign and return an attached request form. JA729. Representatives of Granite and Skanska SE returned their votes, but Lane's Penalver neither responded nor signed the form. JA734, JA737, JA890.

Lane did not pay the January capital call due on January 11, 2021. JA713. When the February working capital call was discussed, Lane again declined to sign the request form. JA890-891. On January 22, 2021, Lane sent a letter informing Skanska SE, as managing partner, that Lane "will not make any further capital contributions." JA743. The letter explained that a "clear conflict of interest" had "caused Skanska SE to act in the best interest of its parent company in breach of its fiduciary duty to its [joint venture] partners," leading to "significant damage to Lane" and that this constituted "an ongoing and material breach of the [JVA] that relieve[s] Lane of its obligations to continue performance." JA743.

On January 28, 2021, SGL informed Lane that SGL considered Lane in default and therefore "Lane no longer has any right to participate in the management of SGL and shall not have any vote on the Executive Committee." JA746. Lane responded that it "is not in default" because "no [January 2021] working capital call ha[d] been approved" given SGL's deviation, once again, "from the requirements of the JVA." JA749. Lane sent SGL a similar letter after the February 2021 call, explaining that "Lane cannot be held in default for failing to make a capital contribution where there was no working capital call issued" and that, because "Lane is not in default," the joint venture "has no right to exclude Lane" from participating in SGL's management. JA752.

Despite Lane's objections, SGL continued to issue "unanimous" monthly working capital calls with only the two votes of Skanska SE and Granite through September 2022. JA1041-1042. For these monthly calls, Skanska SE never invoked Article 4.3 of the JVA, which authorized the managing partner to unilaterally issue calls under certain circumstances.[11] Instead, all monthly capital requests were issued by SGL, not Skanska SE. JA1041-1043.[12]

## II. Procedural History

Lane sued Skanska SE for breach of fiduciary duty in January 2021, during the parties' dispute over the January working capital call. JA60, JA743. In August 2021, Skanska SE answered Lane's complaint and brought counterclaims against Lane for, *inter alia*, breach of contract and indemnification. JA120, JA343. Skanska SE also sued Lane's parent company and guarantor, Webuild, as well as SGL. JA141. Granite then intervened and brought breach of contract and indemnification counterclaims against Lane and Webuild. JA238-239. SGL cross-claimed against Lane and Webuild for breach of contract and indemnification. JA454.

---

[11] Skanska SE purports to have issued only a single unusual *interim* mid-April 2021 capital call pursuant to Article 4.3(b). JA852-853, JA2274.

[12] Although the Project is "substantially complete," JA1039, some work remains, and Lane continues to face capital requests from SGL. JA4445-4450.

## A.    Summary Judgment

Appellees sought summary judgment on their breach of contract and indemnification claims.[13] None claimed Skanska SE had used its managing authority under Article 4.3 to issue the January 2021 call—or any other monthly call. Rather, they argued that Lane consented to the January 2021 call and that the JVA required Lane to keep paying all working capital requests during its lawsuit. JA580, JA680, JA754. Lane opposed summary judgment because of material disputes on consent and validity of the capital calls. JA793, JA822, JA857.

Departing from the Parties' arguments, the district court concluded that these disputes were a "red herring" because "Skanska SE could act unilaterally" under Article 4.3. JA996. The court did not address the undisputed fact that Skanska SE never invoked Article 4.3 in this context, except to say that the lack of any formal notice under Article 4.3 was a non-issue because only "substantial compliance" was required. JA996-997. The court added that "if Lane had problems with the call it still had to pay during the dispute." JA996. Accordingly, the court found Lane liable for breach of contract and reserved damages for trial. JA994-998.

The district court denied Skanska SE's request for summary judgment on Lane's breach of fiduciary duty claim after finding a "clearcut factual dispute on

---

[13] Skanska SE moved for summary judgment on breach of contract only. JA1002 n.9. But the court determined that its reasoning meant that "liability is essentially established" on Skanska SE's indemnification claim also. JA1003 n.9.

whether Skanska SE actually acted on a conflict of interest." JA1000. The court also found that Skanska SE owes Lane fiduciary duties under the Florida Revised Uniform Partnership Act ("FRUPA"). JA999.

## B. Post-Trial Findings of Fact

Following a 10-day bench trial, the court found no evidence of "any improper motive by [Skanska's] Kennedy." JA4619. The court similarly found that Fusco (Skanska SE's CEO) and Ben Subin (SGL's outside counsel) were not inappropriately influenced by Kennedy or Skanska USA. JA4620, JA4624. The district court added that Granite's failure to side with Lane "weighs heavily on the Court's finding that rejecting termination was in SGL's best interest." JA4626.

The court found "it was in [SGL's] best interest to decline to pursue termination and instead pursue settlement negotiations." JA4628. The court listed the following factors as supporting its finding:

> Two of SGL's outside firms had strongly warned against pursuing the termination option based on several elements of risk.[14] There were doubts as to whether I4MP would terminate even if SGL requested it. There were significant questions about whether SGL could prove the requisite delay. Everyone who knew FDOT cautioned that FDOT would take a termination notice or threat very poorly. There were colorable questions about what would happen to SGL's obligations under the DBA even if FDOT agreed to terminate the CA. Walking off the Project

---

[14] While the memoranda note risks to I4MP requesting termination, *see supra* p.10, they do not categorically advise against it, and affirmatively state that sending an equivalent claim notice to I4MP could benefit negotiations. JA1133, JA1142, JA1154. The most cautious, JA3348-3355, asserts it would be difficult to prove 180 days of delay, which Lane disputed at trial, JA4557-4559.

would have subjected SGL to potentially unlimited damages, and no one reasonable actually planned to walk off the Project. And executives at all of the JV partners were deeply concerned that pursuing termination would ruin the companies' reputations and result in war with FDOT.

JA4627-4628. The district court also determined the settlement with FDOT "resulted in . . . very favorable terms for the [joint venture.]" JA4632.

### C. Post-Trial Conclusions of Law

Because the district court had ruled that Skanska SE owes Lane fiduciary duties under FRUPA, JA4635, "only breach and causation of damages" were set for trial. JA4635. On the breach issue, the court previously had noted at summary judgment that the central question is whether Skanska SE "acted on a conflict of interest." JA1000. The court applied a different standard in its post-trial order. There, the court opined that "whether there was actually a conflict is of no moment because the dispositive question is whether Skanska SE acted on that conflict *to Lane's detriment*." JA4636. The district court answered that question in the negative based on its finding that "Skanska SE was acting in the best interest of Lane and the [joint venture] when it chose not to pursue the termination option." JA4635. On damages, the district court concluded Lane could not show causation because the court had found no evidence "that Skanska SE rejecting termination caused Lane any damages." JA4637.

### D. Damages And Prejudgment Interest

The district court awarded damages for the breach of contract claims in its post-trial order. Damages were not based on the working capital call amounts. Instead, the court relied on Article 3.2 of the JVA to rebalance the Parties' proportionate losses, awarding Skanska SE roughly $48.9 million and Granite roughly $30.4 million. JA4679-4681. Over Appellants' objection, the court also awarded Skanska SE and Granite prejudgment interest. JA4652-4654, JA4680. The court postponed ruling on attorneys' fees pending resolution of this appeal. JA4690-4692.

The court entered final judgment against SGL because it "suffered no damages." JA4640. SGL did not file a notice of appeal and is thus not a party to this appeal.

## SUMMARY OF ARGUMENT

**I.** The district court misinterpreted FRUPA in concluding Skanska SE did not breach its fiduciary duties. Under the correct interpretation, Skanska SE breached its duties of loyalty and disclosure.

**A.** FRUPA prohibits joint venture partners from "dealing with . . . [joint venture] business as or on behalf of a party having an interest adverse to the [joint venture]." Fla. Stat. § 620.8404(2)(b). FRUPA's plain text enacts a strict no-conflicts rule; conducting joint venture business with a conflict of interest suffices

for breach. The text does not allow for a fairness defense; a conflicted transaction breaches the duty of loyalty even if it seemingly served the joint venture's best interest. Official commentary confirms that FRUPA derives from agency law, which adopts a strict no-conflicts approach to fiduciary duties, rather than corporate law's more forgiving best-interest defense.

**B.**     The district court improperly imported a best-interest defense into FRUPA. The court then erroneously disposed of Lane's claim based solely on its finding that Skanska SE acted in the joint venture's best interest. It never analyzed whether Skanska SE had a conflict of interest, or how that conflict tainted SGL's decision-making process. Nor did it consider Lane's argument that Skanska SE breached its disclosure obligations.

**C.**     Skanska SE had a conflict of interest because Skanska SE had interests on both sides of the "termination" option: sending I4MP an equivalent claim notice would create leverage for SGL, but risk substantial losses to Skanska ID and Skanska AB. Skanska SE influenced SGL's decision-making over the option while under this conflict. That conflicted action breached FRUPA.

**II.**     The district court, misguided by its failure to analyze Skanska SE's conflict, clearly erred in finding that Lane could show no "reasonable basis" for damages on its breach of fiduciary duty claim. The court further erred in failing to consider other equitable remedies that do not require a showing of pecuniary loss.

**A.** A fiduciary in breach of its duties bears the risk of any uncertainty its breach created. Thus, difficulty in proving the amount of damages caused by a breach does not bar recovery. A plaintiff seeking compensatory damages must only show, with a reasonable degree of certainty, that some damage occurred.

**B.** Lane established a reasonable basis for damages. The record reflects that Lane would be in a materially better position had SGL sent I4MP an equivalent claim notice because doing so would have prompted negotiations with I4MP and provided much needed leverage with FDOT. The district court found otherwise only because it overlooked that the notice was primarily a negotiating tool, and disregarded SGL's need for leverage in settlement talks with FDOT.

**C.** The court further erred in disregarding Lane's request for equitable remedies that do not require a showing of pecuniary loss, including disgorgement, equitable allotment of attorneys' fees and prejudgment interest, nominal damages/declaratory relief, and injunctive relief. These remedies are important because, without them, many breaches of fiduciary duty would go unrectified.

**III.** The district court committed several reversible errors in granting summary judgment to Appellees on their breach of contract claims.

**A.** The court ignored a material dispute of fact. Lane presented competent evidence demonstrating it had no obligation to pay the working capital calls because they were invalid. This should have foreclosed summary judgment.

**B.** The court improperly decided summary judgment on a sua sponte ground. Without notice to the Parties, the court determined that the working capital calls were valid because they were issued in substantial compliance with Article 4.3, even though the undisputed record refutes this contention.

**C.** The court misinterpreted the Parties' agreement. The JVA does not require a member to pay an invalid working capital request just because the other two members insist the request was approved "unanimously."

**D.** The court erred in awarding prejudgment interest because Appellees failed to follow the exclusive contractual mechanism for requesting such interest.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in its favor." *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1172 (11th Cir. 2024). This Court reviews a district court's conclusions of law following a bench trial de novo and its factual findings for clear error. *See CFTC v. Southern Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018). Where the district court applies an incorrect legal standard, which taints or infects its findings of facts, such findings lose the insulation of Rule 52(a) and judgment based thereon cannot stand. *See Manning ex rel. Manning v. School Bd. of Hillsborough Cnty.*,

244 F.3d 927, 940-41 (11th Cir. 2001). Prejudgment interest issues are reviewed de novo. *See McCarthy v. Estate of Krohn*, 16 So. 3d 193, 195 (Fla. DCA 2009).

## ARGUMENT

## I.  THE DISTRICT COURT ERRED IN RULING THAT SKANSKA SE DID NOT BREACH ITS FIDUCIARY DUTIES

Florida embraces the classic Cardozo maxim that "joint adventurers . . . owe to one another, so long as the relationship continues, the duty of the finest and highest loyalty . . . the 'punctilio of an honor the most sensitive.'" *Donahue v. Davis*, 68 So. 2d 163, 171 (Fla. 1953) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (1928)). The district court thus correctly determined that Skanska SE owes Lane fiduciary duties under the Florida Revised Uniform Partnership Act ("FRUPA"), Fla. Stat. § 620.81001 *et seq.*[15] But the court applied the incorrect standard in assessing whether Skanska SE had breached those duties. Rather than consider whether Skanska SE "deal[t] with" business as "a party having an interest adverse to" the joint venture, § 620.8404(2)(b), the court improperly imported a "best interest" defense from corporate law by asking only whether any conflict was to "Lane's detriment." JA4636. Consequently, the district court never considered whether Skanska SE had a conflict of interest. Nor did it evaluate the conflict's repercussions or necessary (and available) remedies.

---

[15] State statute citations are to the Florida Statutes unless otherwise noted.

Under the correct standard, the answer is clear: Skanska SE had a conflict of interest that breached its fiduciary duties and interfered with Lane's right to impartial consideration of the equivalent claim notice option, meriting a remedy.

## A. FRUPA Strictly Prohibits Conducting Joint Venture Business While "Having An Interest Adverse To" The Joint Venture

"The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999); *see also Lopez v. Hall*, 233 So. 3d 451, 453 (Fla. 2018).

### 1. Under FRUPA's plain text, conducting business with a conflict of interest is a breach of fiduciary duty

FRUPA establishes the fiduciary duties that "a partner owes to the partnership and the other partners" in a joint venture. § 620.8404(1); *see also Sheridan Healthcorp, Inc. v. Amko*, 993 So. 2d 167, 170 (Fla. DCA 2008) (partnerships laws govern joint ventures). As relevant here, the partner's "duty of loyalty" includes a duty to "refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership." § 620.8404(2)(b). "The duty of loyalty [also] includes a duty to disclose all material facts concerning the partnership business." J. William Callison & Maureen A. Sullivan, *Partnership Law and Practice* § 12:5 (2024); *see also* § 620.8404 cmt. 4 ("disclosure component" of duty); § 620.8403(3)(a)-(b) (detailing the partners' disclosure obligations).

FRUPA's plain text thus prohibits partners from conducting business as "a party having an interest adverse" to the joint venture. § 620.8404(2)(b). Proof of additional harm is not required for breach. Nor does FRUPA articulate a "best interest" or "fairness" defense characteristic of corporate law. *Cf.* § 607.0831(3)(b) (corporate directors not liable if conflicted transaction was "fair to the corporation"). Rather, FRUPA, which governs general partnerships and joint ventures, not corporations, imposes a strict "no conflicts" rule. Because FRUPA's "statutory language is unambiguous and 'the statutory scheme is coherent,'" the "inquiry must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

### 2. Official commentary further clarifies that FRUPA's prohibition is absolute and lacks a fairness defense

While FRUPA's text unambiguously settles the standard at issue here, official commentary confirms the plain meaning.

FRUPA is an enactment of the Revised Uniform Partnership Act ("RUPA"). *See* RUPA § 404(b)(2) (1997). Official comments explain RUPA's duty of loyalty as "derived from Sections 389 and 391 of the Restatement (Second) of Agency." RUPA § 404 cmt. 2.[16] As such, the duty "is not based upon the harm caused to the

---

[16] Courts routinely invoke the comments to a uniform act as persuasive authority. *See Yale Univ. v. Blumenthal*, 621 A.2d 1304, 1307 (Conn. 1993) (only in this way "can uniformity be achieved"); *Shire v. Unknown/Undiscovered Heirs*, 907 N.W.2d 263, 268 (Neb. 2018) ("[W]hen the Legislature provides a direct reference to a section of a uniform law code when adopting that code, it incorporates the comments explaining that section.").

principal, but upon avoiding a conflict of opposing interests in the mind of an agent whose duty is to act for the benefit of his principal." *Id.* Thus, as the Restatement explains, the duty can be breached "even though the transaction between the principal and the agent is beneficial to the principal." Restatement (Second) of Agency § 309 cmt. c (1958) ("Agency Restatement"). Comments to a later version of RUPA (with the same duty of loyalty language) make this explicit: "Absent informed consent by the partnership," the duty of loyalty, "is breached by the mere existence of the conflict of interest and the partnership need not prove that the outcome of the dealing was adverse to the partnership." Harmonized Uniform Partnership Act ("HRUPA") § 409(b)(2) cmt. (2013).

Indeed, courts should not interpret RUPA's duty of loyalty by "apply[ing] results from cases involving other types of business associations." Christine Hurt et al., *Bromberg and Ribstein on Limited Liability Partnerships, The Revised Uniform Partnership At, and the Uniform Limited Partnership Act* § 8.409 (2001). The rationale for that rule is that, unlike for corporations, partnerships and joint ventures are "closely held business[es]" where partners "participate equally in management rather than delegating management responsibilities." *Id.*

The connection between RUPA and agency law is important because agency law, like trust law, embraces an absolute no-conflicts rule for the duty of loyalty, unlike corporate law, which allows for a best-interest or fairness defense. *See*

Julian Velasco, "Fiduciary Principles in Corporate Law," *in The Oxford Handbook of Fiduciary Law* 66 (2018) (explaining how corporate law differs from "many other areas of [fiduciary] law"). Official commentary thus confirms what the text already makes clear: there is no best-interest defense to FRUPA.

## B. The District Court Applied The Incorrect Standard When Assessing Skanska SE's Breach Of Fiduciary Duty

The district court committed two legal errors in assessing Lane's breach of fiduciary duty claim. First, it improperly imported a best-interest defense into § 620.8404(2)(b). It erroneously assumed that because it had found that "Skanska SE was acting in the best interest of Lane and the [joint venture] when it chose not to pursue the termination option," it did not matter "whether there was actually a conflict." JA4635-4636. The district court thus never made any factual finding regarding Skanska SE's conflict of interest. That approach is contrary to FRUPA's strict, no-conflict standard under which the relevant question is "whether there was actually a conflict" in Skanska SE's handling of joint venture business.[17]

---

[17] The court even misapplied a corporate-like fairness defense. In corporate law, once a conflict of interest is shown, the burden shifts to the fiduciary, who must prove the conflicted transaction was both substantively and procedurally fair, with the latter encompassing questions about how the transaction was "timed, . . . initiated, structured, negotiated, [and] disclosed." *Williams v. Stanford*, 977 So. 2d 722, 728 (Fla. DCA 2008). The district court rejected any burden-shifting framework and at most considered whether the conflicted transaction was substantively fair. JA4635 n.8.

Second, the district court failed to consider Lane's argument that Skanska SE had breached its related obligation of disclosure by failing to "disclose the extent of the conflict, including Skanska ID's financial incentives." JA4557, JA4581-4595. The fact that Lane demanded this information and Skanska SE refused to provide it suffices for a breach of the disclosure obligation. *See* § 620.8403(3)(b) ("Upon demand" each partner shall furnish any reasonable "information concerning the partnership's business and affairs."). Even absent a demand, however, Skanska SE was obligated to disclose all facts relevant to the conflict. *See* § 620.8403(3)(a); *see also Alloy v. Wills Fam. Tr.*, 944 A.2d 1234, 1254-55 (Md. Ct. Spec. App. 2008) (disclosure obligation extends to all "Partnership opportunities and conflicts").

### C. Under The Correct Standard, Skanska SE Breached Its Fiduciary Duties To Lane

Applying the correct standard, Skanska SE dealt with "[SGL] business as or on behalf of a party having an interest adverse to the partnership." § 620.8404(2)(b). RUPA comments explain that "adverse interest" means "to be on the other side of the table in some dealing with the [joint venture]." *See* HRUPA § 409(b)(2) cmt. Thus, a conflict of interest exists where there is a "real or seeming incompatibility between two interests that one possesses or is obligated to serve." *Conflict of Interest*, Black's Law Dictionary (12th ed. 2024). The paradigmatic example is where a partner, or its affiliate, stands to benefit from a decision that

34

will harm the partnership. *See*, *e.g.*, *Carolina Pres. Partners, Inc. v. Wolf Arbin Weinhold*, 414 B.R. 754, 762-63 (M.D. Fla. 2009).

The trial evidence showed Skanska SE labored under a conflict of interest. As managing partner, Skanska SE owed sole allegiance to the joint venture. Yet because its sister corporation, Skanska ID, was "on the other side of the table" as part of I4MP, Skanska SE had conflicting interests. In fact, sending an equivalent claim notice to I4MP was an attractive negotiating tactic precisely because it would put I4MP in a "difficult predicament." Thus, SGL's and I4MP's interest were adverse on this option from the start, as Skanska SE's in-house counsel admitted at trial. JA3427. However, because of its close corporate relationship with Skanska ID, and the influence of their parent corporation, Skanska SE was conflicted from advancing the interest that would serve SGL to the detriment of Skanska ID. And because Skanska ID would gain much more from continuing the Project than Skanska SE would lose, their corporate parent, Skanska AB, stood to benefit from Skanska SE favoring its sister corporation's broader interests over those of SGL. Thus, the Skanska entities' "dual stake" in the Project was not, as Kennedy urged, "a strength," but an obvious conflict of interest, as Lane repeatedly objected. The district court completely overlooked that conflict of interest.

Skanska SE therefore engaged in discussions over the equivalent claim notice option "as or on behalf of a party having an interest adverse to the

partnership," thus tainting SGL's decision-making process. § 620.8404(2)(b).

Nowhere was this clearer than in Kennedy's appearances at the October 2018

meetings on the topic, where he announced Skanska's opposition to sending an

equivalent claim notice to I4MP. *See supra* pp.11-14. Indeed, Kennedy's influence

is emblematic of the larger issue that Skanska entities operated as "One Skanska,"

with no firewalls or other precautions to insulate Skanska SE's interests from

Skanska ID's. Because testimony revealed Skanska SE was required to run all

major decisions by Skanska AB—the corporate parent of both Skanska ID and

Skanska SE—Skanska SE could not take positions that would harm its corporate

sister. JA3910. This conflict deprived Lane of its right to detached, independent,

unconflicted fiduciary decision-making on whether to send an equivalent claim

notice, in direct violation of Skanska SE's duty of loyalty.

The district court's finding that Kennedy genuinely "doubted the viability of

the termination option," JA4620, does not solve the tainted decision-making

process. Nor does it matter that the court found that Skanska SE's CEOs were

"skeptical of termination from the start" or that "[u]ltimately, Skanska SE decided

that pursuing the termination option was not in the [joint venture's] best interest."

JA4620, JA4624-4625. Where a fiduciary is "subject to conflicting interests . . . [i]t

is no answer to say that fraud or unfairness were not shown to have resulted."

*Woods v. City Nat'l Bank & Tr. Co.*, 312 U.S. 262, 268 (1941). The court's findings

regarding Kennedy's and Skanska SE's purported rationales reflecting their subjective beliefs are thus simply not relevant to the issue of breach. A fiduciary may not defend himself by "insisting that although he had conflicting interests, he served his several [loyalties] equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Id.* at 269.

Only "strict adherence" to a no-conflicts rule "can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.' " *Id.* FRUPA embodies this no-conflicts rule by prohibiting any "party having an interest adverse to the partnership" from "dealing with . . . partnership business." § 620.8404(2)(b). Skanska SE's conduct readily satisfies both elements: Skanska SE had a conflict of interest on whether to send I4MP an equivalent claim notice, and yet Skanska SE led and influenced SGL discussions on that topic without enacting a firewall or otherwise addressing the conflict. The district court erred in ruling otherwise.

## II.    THE DISTRICT COURT ERRED IN FINDING NO AVAILABLE REMEDY FOR SKANSKA SE'S BREACH OF FIDUCIARY DUTY

The district court relied on its best-interest finding to conclude Lane could not establish damages. JA4637. This finding, however, is "tainted" by the court's failure to make a finding regarding Skanska SE's conflict of interest, such that it "lose[s] the insulation of" Rule 52(a). *Manning*, 244 F.3d at 940-41. The record shows that, by not sending an equivalent claim notice, SGL lost any leverage to

37

recover even part of its losses from I4MP. That alone establishes a reasonable basis for compensatory damages. Moreover, even assuming Lane cannot establish a basis for compensation (which it can), the district court incorrectly disregarded the possibility of awarding other equitable remedies that do not hinge on a showing of pecuniary loss, as is common for breaches of fiduciary duty.

### A. Flexible Remedies Are Available For A Breach Of Fiduciary Duty

FRUPA authorizes actions "for legal or equitable relief." § 620.8405(2). This flexibility aligns with the equitable origins of fiduciary law because "courts of equity have a large [remedial] jurisdiction over all matters of trust and confidence." *Quinn v. Phipps*, 113 So. 419, 422 (1927).

Where the plaintiff seeks compensatory damages for breach of fiduciary duty, "uncertainty or difficulty in proving the amount of damages will not prevent recovery." *Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F.3d 1277, 1280 (11th Cir. 2012) (per curiam); *see also Twyman v. Roell*, 166 So. 215, 218 (Fla. 1936) (same). This is especially true where, as here, the breach is the source of the uncertainty. Because "the wrongdoer must bear the risk of the uncertainty, it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference." *Britt Green Trucking, Inc. v. FedEx Nat'l, LTL, Inc.*, 2014 WL 3417569, at *7 (M.D. Fla.) (cleaned up).

Courts have identified ways to address uncertainty stemming from wrongdoing. For example, "when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount." *See*, *e.g.*, *Gratz v. Claughton*, 187 F.2d 46, 51-52 (2d Cir. 1951) (Hand, J.). Only where the plaintiff cannot establish the "*fact* of damage" by showing "to a reasonable certainty that some damage occurred," are compensatory damages inappropriate. *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1342 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (per curiam). Still, even in such situations, courts may exercise their equitable authority to award other remedies that do not require proof of pecuniary loss to the plaintiff. *See Woods*, 312 U.S. at 268. Doing so is highly consistent with FRUPA's no-conflicts rule, which treats deprivations of unconflicted fiduciary decision-making as harmful.

### B. The District Court Clearly Erred In Finding Lane Was Not Entitled To Compensatory Damages

The district court found it "damning" that "no one knows exactly what would have happened had the [joint venture] made a demand for termination." JA4637. But "the incidence of a particular conflict of interest can seldom be measured with any degree of certainty." *Woods*, 312 U.S. at 268. Plaintiffs seeking compensatory damages for breach of fiduciary duty must thus only show "to a reasonable certainty that some damage occurred." *Alphamed*, 432 F. Supp. 2d at

1342. Even so, the court found (erroneously) that Lane could not make this showing because the "evidence suggests that the partners would have suffered significant damage by threatening or pursuing termination, and Skanska SE acted in the [joint venture's] best interest to avoid that outcome." JA4638.

The district court's failure to analyze whether Skanska SE had a conflict of interest directly led to this erroneous factual finding, which therefore "lose[s] the insulation" of Rule 52(a). *Manning*, 244 F.3d at 940-41. Because the court failed to make a finding on the conflict-of-interest issue, it never properly considered the repercussions of Skanska SE's conflict. In particular, the court largely overlooked Lane's argument that the conflict prevented "unbiased consideration" of the equivalent claim notice option, the main point of which was to create leverage by putting I4MP in a "difficult predicament." JA4537-4538. Moreover, in finding that Granite's failure to side with Lane "weigh[ed] heavily" on its best-interest finding, the court failed to address the conflict's effect on Granite's decision-making.

This oversight matters. The record shows SGL had little to lose, but much to gain, from sending I4MP an equivalent claim notice. Upon receiving that notice, I4MP would have needed to choose among three options,[18] none favorable to

---

[18] Again, these options are (1) send a termination request to FDOT; (2) provide SGL with "equivalent project relief" by offering SGL the same relief from its losses that it would receive from termination; or (3) dispute SGL's notice as defective or frivolous, exposing I4MP to liability. JA1156, JA3385-3387.

I4MP, thus putting I4MP in a "difficult predicament." *See supra* p.8-9. The district court cited no evidence that creating that predicament for I4MP carried any substantial risks for SGL. Rather, both legal memoranda analyzing the strategy and witnesses at trial attested that putting I4MP in this predicament could benefit SGL by forcing I4MP to negotiate. *See supra* pp.8-10. Skanska SE's derailing of SGL's discussions over sending such a notice thus materially damaged Lane by wrongfully depriving SGL of benefits from negotiations with I4MP.

Instead of engaging with this argument, the district court considered only what would have happened in the rather unlikely event I4MP actually chose to "threaten[] or pursu[e] termination" with FDOT. JA4638. The court focused on certain "factors" to rationalize why Skanska SE supposedly acted in Lane's "best interest." JA4627-4628. But each factor—uncertainty over proving 180 days of delay, questions about whether termination would be successful, the effect on ongoing negotiations with FDOT, and reputational risks—would have become relevant only if I4MP chose to ask FDOT for termination, which I4MP could have avoided simply by negotiating with SGL, or paying "equivalent project relief," as calculated by Lane's damages expert. JA1557, JA3009-3010.

Furthermore, even the court's analysis of the consequences of requesting termination from FDOT overlooked a critical fact. Because the individual claims SGL submitted to FDOT did not come remotely close to accounting for the

$500 million total project losses, SGL's goal in negotiation was a "global reset" that would bring project losses back to zero. JA3148. That goal was attainable, however, only if SGL had substantial leverage, which only a termination request would have provided. Lane thus reasoned that the risks were worth taking because "continuing to perform without forcing some type of action on the part of I4MP and FDOT will surely result in significant financial losses to SGL." JA4650. Because of Skanska SE's conflict, however, that strategy never received fair consideration. The resulting lack of leverage meant that Fusco, Skanska SE's CEO, was never able to attract the attention of Florida's Secretary of Transportation, as a "global reset" would have required. JA3604-3606. Instead, he was left to negotiate with district leadership that rejected his last offer of $375 million, insisting on a final take-it-or-leave-it counteroffer of just $125 million. JA2263.

Thus, contrary to the district court's reasoning, Lane did show "a reasonable basis for the damages." JA4637. In addition to eliminating SGL's only opportunity for real leverage with FDOT, Skanska SE's breach deprived SGL of a substantial (and low-risk) negotiation tool with I4MP. Because Lane has shown that "some damage occurred," *Alphamed*, 432 F. Supp. 2d at 1342, Appellants respectfully ask that the Court remand for the district court to assess the appropriate remedy.

### C. The District Court Erred In Disregarding Equitable Remedies

Requiring proof of damages to address a breach of fiduciary duty would effectively license a breach whenever no such showing can be made. Accordingly, "a court may use the full range of its equitable powers to fashion an appropriate remedy" for a breach of fiduciary duty. *See* Bromberg, *supra*, at § 6.07(i). Many equitable remedies do not require a showing of financial loss to the plaintiff, and such remedies are often used in fiduciary law, where the breach of one's duty of loyalty is considered the harm. *See* Samuel Bray, "Fiduciary Remedies," *in The Oxford Handbook of Fiduciary Law* 79 (2019) (cataloguing the "many fiduciary remedies"). Thus, even holding fixed the district court's finding that Lane cannot establish financial damage (which it can), the court erred in failing to consider alternative remedies to rectify the wrong of Skanska SE's breach of fiduciary duty.

Lane's complaint sought, *inter alia*, a "[d]eclaration that Skanska breached its fiduciary duties," attorneys' fees, and "equitable relief" including "restitution and disgorgement" as well as "such other and further relief as the Court deems just and appropriate." JA79-80. At trial, Lane reiterated its request that the court use its discretion "to fashion an appropriate remedy." JA4593—citing *Saeme v. Levine*, 2012 WL 13134605, at *3 (S.D. Fla.) (courts "in equity ha[ve] power to remedy abuse of fiduciary [duty] in whatever form . . . because 'courts of equity have a large jurisdiction over all matters of trust and confidence'").

Thus, at a minimum, Appellants respectfully request vacatur of the court's denial of relief and remand for a hearing on appropriate equitable relief. *See In re Global Energies, LLC*, 763 F.3d 1341, 1350 (11th Cir. 2014) (per curiam) (directing on remand "any hearings necessary in the exercise of [the court's] powers at law or in equity"). Appropriate forms of equitable relief might include the following, none of which require a showing of financial loss.

## 1. Disgorgement of Skanska's ill-gotten gains is appropriate

"Disgorgement is an equitable remedy intended to prevent unjust enrichment." *SEC v. Monterosso*, 557 F. App'x 917, 928 (11th Cir. 2014) (per curiam). It is often awarded in response to a breach of fiduciary duty. *See*, *e.g.*, *Bailey v. St. Louis*, 268 So. 3d 197, 201-03 (Fla. DCA 2018); *King Mountain Condo. Ass'n, Inc. v. Gundlach*, 425 So. 2d 569, 571 (Fla. DCA 1982).

Disgorgement stems from a defendant's gain, not a plaintiff's loss. *See Bailey*, 268 So. 3d at 202; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011) ("Restitution Restatement"); Agency Restatement § 403. Thus, a plaintiff's loss is unnecessary. *See* Restitution Restatement § 3 cmt. c. For disgorgement, a party need only approximate the defendant's ill-gotten gains; "exactitude is not a requirement." *Monterosso*, 557 F. App'x at 928.

Skanska SE's breach benefited its affiliates. An equivalent claim notice would have left Skanska ID with only three costly options. *See supra* n.18. The

breach prevented Skanska ID from having to bear those costs. Lane should receive a "reasonable approximation" of this benefit. *Monterosso*, 557 F. App'x at 928.

## 2. Skanska SE's breach merits shifting attorneys' fees

"The court also may award attorneys' fees in cases of bad-faith conduct." *See* Bromberg, *supra*, at § 6.07(i). Although an award of attorneys' fees generally requires a contractual or statutory basis, Florida courts have recognized "an exception allowing an equitable award of fees" for breach of fiduciary duty. *Larmoyeux v. Montgomery*, 963 So. 2d 813, 820 (Fla. DCA 2007). That cost-shifting rule applies under RUPA: "two [other] RUPA states have continued to apply common law cost-shifting principles after adopting [RUPA]." *Id.*

While this exception historically focused on cases involving an "accounting of profits"—the traditional remedy in a partnership action for breach of fiduciary duty—RUPA no longer contains such a limitation. *See* § 620.8405(2) ("equitable relief" is available "with or without an accounting"). Florida's equitable exception is thus best understood to apply beyond accounting actions as well. *Cf. Horne v. Aune*, 121 P.3d 1227, 1236 (Wash. Ct. App. 2005) (recognizing generally that "when a partner breaches his fiduciary duties, a fee award is within the trial court's discretion"). As such, on remand the district court would have discretion to award Lane attorneys' fees associated with litigation over its fiduciary duty claim.

### 3.    A denial of prejudgment interest is warranted

Skanska SE's breach of fiduciary duty also justifies the use of equitable

authority to deny prejudgment interest. *See Blasland, Bouck & Lee, Inc. v. City of*

*N. Miami*, 283 F.3d 1286, 1297 (11th Cir. 2002) ("When a court is deciding

whether to award prejudgment interest . . . 'the law is not absolute and may depend

on equitable considerations.'"). In Florida, "prejudgment interest 'is denied when

its exaction would be inequitable.'" *PODS Enters., LLC v. U-Haul Int'l Inc.*, 126

F. Supp. 3d 1263, 1289 (M.D. Fla. 2015). Lane cited Skanska SE's breach of

fiduciary duty, along with the invalidity of the working capital requests, as its

reason for withholding payments. JA1092. These "unique facts and 'considerations

of fairness' militate against calculating prejudgment interest from the date of actual

loss." *Arizona Chem. Co. v. Mohawk Indus.*, 197 So. 3d 99, 105 (Fla. DCA 2016).

### 4.    Nominal damages and a declaratory judgment are appropriate

"Nominal damages can be awarded when a legal wrong has been proven, but

the aggrieved party has suffered no damages or where recoverable damages were

not proven." *Stevens v. Cricket Club Condo., Inc.*, 784 So. 2d 517, 519 (Fla. DCA

2001) (per curiam) (cleaned up).[19] Awarding nominal damages for a breach of

---

[19] Appellants preserved this claim by requesting actual damages and "such other and further relief as the Court deems just and appropriate." JA80. *See D. H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 2021 WL 2819778, at *4 (N.D.

fiduciary duty without actual damages serves important functions, including deterring future misconduct, acting as a "catalyst for changes" in the partnership, and "shift[ing] expenses incurred in litigating a breach of fiduciary duty to the breaching partner." *Alloy*, 944 A.2d at 1261. Such relief in this case would help serve those functions.

Declaratory judgment is a similar form of relief. Lane's complaint requested a "[d]eclaration that Skanska breached its fiduciary duties to SGL and Lane." JA79. The court dismissed that claim at summary judgment on the ground that it was "subsumed within the [breach of] contract claims." JA993. But that ruling was an abuse of discretion because the requested declaration is entirely distinct from Appellees' breach of contract claims. *See James River Ins. v. Rich Bon Corp.*, 34 F.4th 1054, 1058 (11th Cir. 2022) (dismissals of declaratory relief reviewed for abuse of discretion). Were this Court to reverse that dismissal, Lane could renew its request for declaratory relief on remand.

### 5. The ongoing partnership justifies injunctive relief

Fiduciaries may also be enjoined to perform their duties or refrain from taking actions inconsistent with their duties. *See, e.g.*, *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 203 (Tex. Ct. App. 2012); *Harvard v.*

---

Ga.); *see also Land & Sea Petrol. Holdings, Inc. v. Leavitt*, 321 So. 3d 810, 815 (Fla. DCA 2021) (nominal damages need not be specially pleaded).

*Walton*, 257 S.E.2d 280, 280-82 (Ga. 1979); *Northeast Nat. Energy LLC v. Pachira Energy LLC*, 844 S.E.2d 133, 140-142 (W.Va. 2020).

Here, injunctive relief may be appropriate because the joint venture remains active. While the Project has reached "substantial completion,"[20] the work is not yet final, and Lane continues to face working capital calls and managerial decisions from Skanska SE. JA4445-4450. Moreover, negotiations with FDOT remain ongoing over an additional "'cumulative impact claim,' seeking recovery of an additional $368 million." JA4632. An order directing Skanska SE to follow all JVA procedures and honor Lane's full rights under the agreement, including Lane's right to conflict-free decision-making, could help prevent further lapses in fiduciary duty. A hearing on remand would allow the district court to assess the ongoing implications of Skanska SE's breach of fiduciary duty.

## III. THE DISTRICT COURT COMMITTED MULTIPLE REVERSIBLE ERRORS IN GRANTING SUMMARY JUDGMENT ON APPELLEES' BREACH OF CONTRACT AND INDEMNIFICATION CLAIMS

The district court granted summary judgment to Appellees on their breach of contract and indemnification claims after concluding Lane improperly failed to pay working capital requests starting in January 2021. That was error. First, the court

---

[20] "Substantial completion" occurs upon the certified completion of certain events and conditions specified in the Design-Build Agreement. JA1211-1212, JA1437. Completion of yet further conditions is required for "Final Acceptance" of the Project. JA1215-1218, JA1409.

ignored a material dispute over the validity of the working capital requests. Second, it sought to justify this misstep by sua sponte, and without notice, relying on an alternative ground refuted by the record. Third, it used a misinterpretation of the JVA to bolster its reasoning. The grant of summary judgment must be reversed along with the damages award and prejudgment interest.

## A.    The District Court Ignored A Material Dispute Of Fact Over The Validity Of The Working Capital Requests

For a working capital call to be valid under the JVA, it must be issued in one of two ways. Either the Executive Committee can approve the request by unanimous written vote, under Article 7.1, or Skanska SE (in certain emergency situations and with written notice) can invoke Article 4.3 to unilaterally issue the call as managing partner. At summary judgment, neither Skanska SE nor Granite argued Skanska SE had issued the January 2021 working capital call under Article 4.3. Thus, the only issue was whether the January 2021 call was unanimous, and therefore valid, or non-unanimous, and therefore invalid.

Lane presented ample evidence that the Executive Committee did not unanimously approve the January 2021 working capital request. No vote took place at the relevant Executive Committee meeting and Lane never signed the working capital request form. Appellees' only contrary argument relied on a post-meeting email in which Penalver, Lane's representative on the Committee, replied—in response to supporting financials circulated by SGL—that he

"review[ed] it and it looks ok." JA727. Penalver attested, however, he meant only that he found the call amount appropriate given the financials and would expect to see that amount on a forthcoming working capital request form. JA889. After Penalver's response, SGL's representative circulated another email titled "SGL Cash Call – Due Jan 11, 2021" asking the representatives to sign the January 2021 working capital request form, which was attached to the email. JA729. Because Penalver never signed that form—which was the Parties' agreed-to method for establishing unanimous consent—a material dispute existed over whether the Executive Committee unanimously approved the January 2021 request.

That material dispute should have foreclosed summary judgment. Because the Parties disputed the validity of the January 2021 call, the district court erred in finding that "[i]t is undisputed" that there was "a call for January 2021 and Lane did not pay it" such that "Lane defaulted and materially breached." JA995. Without a valid January 2021 working capital request, Lane had no contractual duty to pay the requested sum; hence, no contract breach.[21]

---

[21] Granite previously endorsed the argument that one has no duty to pay invalidly issued working capital requests. Granite did not pay an unusual, mid-month capital call in April 2021 (the only call Skanska SE purports to have issued pursuant to its Article 4.3 authority). When the district court asked Granite why it had failed to pay this call, Granite argued it had no duty to pay an invalidly-issued call: Skanska SE's failure to follow proper procedures for exercising its Article 4.3 authority meant that "the interim capital call was invalid under the actual terms of the [JVA]," and Granite had no duty to pay it. JA912.

A similar logic applies to the subsequent monthly working capital requests. Appellees never asserted Skanska SE authorized those requests under Article 4.3. Instead, they claimed the requests were "unanimously" approved under Article 7.1 because Lane's alleged January 2021 default stripped Lane of its voting rights (pursuant to Article 8.2) making Granite's and Skanska SE's votes sufficient for unanimity. If Lane did not breach in January 2021, however, then Lane retained its voting rights, rendering the later calls also non-unanimous, and thus also invalid.

Ignoring the Parties' material dispute over the validity of the working capital requests was reversible error. Where, as here, a district court "fail[s] to consider" evidence "creating a genuine dispute of fact" at summary judgment, a reversal and remand is appropriate. *Serendipity at Sea, LLC v. Underwriters at Lloyd's of London*, 56 F.4th 1280, 1290 (11th Cir. 2023).

**B. The District Court Erred In Deciding Summary Judgment On A Sua Sponte Ground Without Notice And In Conflict With The Record**

The court dismissed the Parties' dispute over the unanimity of the working capital requests by sua sponte relying on Skanska SE's authority under Article 4.3. The court reasoned that the dispute did not matter because "Skanska SE could act unilaterally to avoid default." JA995-996. Perhaps aware that the mere availability of Article 4.3—if left unexercised—is not enough to render the calls valid, the court added that Skanska SE had shown "substantial compliance" with Article 4.3

because the financial strains of the partnership "entitl[ed] Skanska SE to make a unilateral call" and because any "technical problems" with providing written notice under Article 4.3 were a non-issue given that Lane received "actual notice." JA996. This ruling must be reversed because it (1) was issued without notice and (2) is contradicted by the undisputed record.

### 1. The court issued its sua sponte ruling without notice

Under Federal Rule of Civil Procedure 56(f), a district court may "grant [summary judgment] on grounds not raised by a party," but only "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f); *see also Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1264-65 (11th Cir. 2008) ("Although a court may *sua sponte* grant summary judgment on a claim not presented in a summary judgment motion, the court is required to give notice to the parties that it intends to address the claim on summary judgment."); *Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006) (same).

"[N]othing in the record placed the parties on notice that the district court would consider the [Article 4.3 substantial-compliance] issue when deciding whether to grant summary judgment." *Karlson v. Red Door Homes, LLC*, 553 F. App'x 875, 877-78 (11th Cir. 2014) (per curiam). The Parties never raised the argument, and the district court gave no indication at the summary-judgment hearing that it was considering ruling on this ground, despite telling the Parties it

would use the hearing in part to "give you some of my thoughts" on the summary judgment motions. JA903. "Accordingly, the district court's grant of summary judgment . . . was in error." *BancTec*, 459 F.3d at 1191.

### 2. The court's sua sponte ruling is contrary to the record

Moreover, the undisputed record contradicts the court's reasoning. Skanska SE knew how to invoke Article 4.3 because it did so in approving the settlement with FDOT over Lane's objection. There, Skanska SE provided written notice invoking its authority. That did not occur with the working capital requests at issue here. Rather, SGL—not Skanska SE—issued each of those requests, thus foreclosing the possibility Skanska SE issued them under Article 4.3. Indeed, Skanska SE claims it issued only one working capital call through Article 4.3 (an unusual interim working capital call in April 2021)—a fact directly at odds with the court's reasoning. *See* JA852, JA2274.

This Court "will reverse a district court's grant of summary judgment if it overlooks evidence contradicting factual points key to the holding." *Knowles v. Hart*, 825 F. App'x 646, 648 (11th Cir. 2020) (per curiam). Because undisputed evidence shows Skanska SE did not issue the working capital requests under Article 4.3, this Court should reverse and remand for a determination of whether the calls were unanimous, and thus valid, or non-unanimous, and thus invalid.

### C. The District Court Misinterpreted The JVA In Concluding Lane Had To Pay The Capital Calls While Disputing Their Validity

The court committed further reversible error by misinterpreting Lane's duties under the JVA. *See Graham v. Texas Gulf Sulphur Co.*, 457 F.2d 418, 420 (5th Cir. 1972) ("Because we believe the District Court incorrectly interpreted the contracts in granting summary judgment . . . we reverse and remand the case.").

To establish that Lane breached the JVA, Appellees needed to show (1) duty, (2) breach, and (3) damages. JA994. Lane provided evidence that its non-payments did not breach the JVA because the relevant duty is the duty to pay all approved working capital calls and the calls at issue were never validly approved. *See supra* pp.49-51. For most of its analysis, the district court appeared to agree that the relevant duty is to pay validly issued working capital calls. Toward the end of its analysis, however, the court stated that "the JVA requires Lane to pay *even if it disputed the call*." JA997 (emphasis added). It believed that Article 7.2 was the source of that duty. JA996. This was legal error, as Article 7.2 does not apply here.

Contrary to the court's suggestion, the JVA does not contain any provision requiring a member to pay a working capital request when two out of the three members insist, contrary to the third, that the request was approved "unanimously." Instead, the JVA creates a mechanism for dealing with situations of non-unanimity. Specifically, the managing partner (Skanska SE) can choose, in certain situations, to unilaterally authorize a working capital call under Article 4.3(b).

Once the managing partner invokes Article 4.3(b), this triggers the availability of a dispute-resolution provision under Article 7.2:

> *If a Working Capital Call is made by the Managing Party in accordance with . . . subparagraph 4.3(b) of this Agreement* due to lack of unanimity of the Executive Committee, but a dissenting Party disputes the need for or the amount of the Working Capital Call, it may . . . deliver a written notice . . . requiring the Executive Committee to select . . . a certified public accountant . . . to conduct an independent review.

JA1099 (emphasis added).

Article 7.2 is thus not relevant here because Skanska SE did not issue the January 2021 call, or any subsequent monthly call, pursuant to Article 4.3(b). *See supra* pp.53. Lane thus had no opportunity to consider invoking Article 7.2,[22] and thus no obligation under Article 7.2 to make payments pending resolution. JA1099 (Art. 7.2) ("Pending resolution of a Working Capital Call dispute *under this subparagraph 7.2*, the dissenting Party . . . shall continue to meet the Working Capital Call requirements.") (emphasis added).

---

[22] Furthermore, under Article 7.2's plain language, Lane could not have invoked that article because it applies only to disputes over "the need for or the amount of" a working capital request—the kinds of disputes a certified public account can help resolve. That is a categorical mismatch for Lane's breach of fiduciary duty complaint. If anything, the more apt provision is Article 19, which governs general disputes relating to the JVA. JA1109. Article 19 states that, when the members cannot unanimously resolve their disputes through negotiation, a member may pursue litigation, as Lane did here. JA1109 (Art. 19.2). Article 19 makes no mention of having to make continued payments during the pendency of the dispute.

In short, nothing in the JVA mandated that Lane continue to pay the working capital requests after disputing their validity. In fact, Skanska SE's failure to invoke Article 4.3, and not Lane's non-payment, disregarded the JVA's prescribed method for resolving non-unanimity over a working capital request vote. The district court's contrary conclusion was legal error.

### D. Appellees Are Not Entitled To Prejudgment Interest

The court compounded its errors by incorrectly awarding Appellees prejudgment interest on their breach of contract and indemnification claims. Article 8.2 provides that when one member pays "all or part of" a defaulting party's contribution to a working capital call, the non-defaulting member may treat it as a "demand loan" subject to interest. JA1100. However, the court found that—except for one $570,000 payment—none of Appellees' payments were "demand loans" because SGL inflated the call amounts starting in 2021, such that Appellees never actually paid "all or part of" Lane's contribution. JA4218-4219, JA4640.[23] Instead, the district court awarded damages under the general indemnification provision at Article 3.2, which lacks an interest requirement. JA1095, JA4639, JA4641 n.17, JA4679-4681.

---

[23] For example, if SGL needed $14 million, it would request $20 million—$8 million from Skanska SE, $6 million from Granite, and $6 million from Lane—knowing it would only get $14 million.

"[I]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject." *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. DCA 2006). Because Article 8.2 specifies the mechanism for seeking prejudgment interest on a defaulted capital call, and the general indemnification provision at Article 3.2 mentions neither interest nor working capital calls, Article 8.2 provides the exclusive mechanism for obtaining prejudgment interest on defaulted capital calls. Because Appellees did not follow Article 8.2, an award of prejudgment interest was inappropriate.

## CONCLUSION

The Court should reverse the district court's ruling that Skanska SE did not breach its fiduciary duties, vacate the court's other rulings, and remand for further proceedings on the proper remedy for Skanska SE's breach of fiduciary duty.

Dated: October 23, 2024

Respectfully submitted,

*/s/ David C. Frederick*
David C. Frederick
Kelley C. Schiffman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dfrederick@kellogghansen.com
kschiffman@kellogghansen.com

Michael S. McNamara
Gerald Zingone
Shelby L. Dyl
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
1200 Seventeenth St., N.W.
Washington, D.C. 20036
Phone: (202) 663-9010
michael.mcnamara@pillsburylaw.com
gerald.zingone@pillsburylaw.com
shelby.dyl@pillsburylaw.com

*Counsel for Appellants The Lane
Construction Corporation and
Webuild S.p.A. Inc.*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, according to the word-processing system used to prepare it (Microsoft Word 2016), it contains 12,994 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *David C. Frederick*
David C. Frederick

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *David C. Frederick*
David C. Frederick

# ADDENDUM

# TABLE OF CONTENTS

Page

Florida Revised Uniform Partnership Act, Fla. Stat. § 620.81001 *et seq.*:

§ 620.8403.............................................................................Add. 1

§ 620.8404.............................................................................Add. 2

§ 620.8405.............................................................................Add. 4

# Fla. Stat. § 620.8403
## Partner's rights and duties with respect to information.

(1) A partnership shall keep its books and records, if any, at the chief executive office of the partnership.

(2) A partnership shall provide partners and their agents and attorneys access to the books and records of the partnership. The partnership shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to inspect and copy books and records during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.

(3) Each partner and the partnership shall furnish to a partner, and to the legal representative of a deceased partner or partner under legal disability:

(a) Without demand, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this act; and

(b) Upon demand, any other information concerning the partnership's business and affairs, except to the extent the demand or the information demanded is unreasonable or otherwise improper under the circumstances.

# Fla. Stat. § 620.8404
## General standards of partner's conduct.

(1) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care, as set forth in subsections (2) and (3).

(2) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(a) To account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

(b) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

(c) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(3) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(4) A partner shall discharge the duties to the partnership and the other partners under this act or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

(5) A partner does not violate a duty or obligation under this act or under a partnership agreement merely because the partner's conduct furthers the partner's own interest.

(6) A partner may lend money to and transact other business with the partnership, and as to each loan or transaction, the rights and obligations of the partner are the same as those of a person who is not a partner, subject to other applicable law.

(7) This section applies to a person winding up the partnership business as the personal or legal representative of the last surviving partner as if the person were a partner.

# Fla. Stat. § 620.8405
## Actions by partnership and partners.

(1) A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.

(2) A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

(a) Enforce such partner's rights under the partnership agreement;

(b) Enforce such partner's rights under this act, including:

1. Such partner's rights under § 620.8401, § 620.8403, or § 620.8404;

2. Such partner's right upon dissociation to have the partner's interest in the partnership purchased pursuant to § 620.8701 or enforce any other right under §§ 620.8601-620.8705; or

3. Such partner's right to compel a dissolution and winding up of the partnership business under § 620.8801 or enforce any other right under §§ 620.8801-620.8807; or

(c) Enforce the rights and otherwise protect the interests of such partner, including rights and interests arising independently of the partnership relationship.

(3) The accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law. A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.