**Case No. 24-12638-GG**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

THE LANE CONSTRUCTION CORPORATION,
*Plaintiff-Counter Defendant-Appellant*,

WEBUILD S.P.A.,
*Counter Defendant-Appellant,*

v.

SKANSKA USA CIVIL SOUTHEAST, INC; GRANITE CONSTRUCTION COMPANY,
*Defendants-Counter Claimants-Appellees*,

SKANSKA-GRANITE-LANE, JOINT VENTURE,
*Counter Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida (Orlando Division)
No. 6:21-cv-00164-RBD-DCI (Hon. Roy B. Dalton, Jr.)

---

## ANSWER BRIEF OF APPELLEE, SKANSKA USA CIVIL SOUTHEAST, INC.

---

Gary M. Stein
Jerry P. Brodsky
Charles E. Fombrun
Nadia Ennaji
PECKAR & ABRAMSON, P.C.
One Southeast Third Avenue, Suite 2000
Miami, FL 33131

*Counsel for Skanska USA Civil Southeast*

## CERTIFICATE OF INTERESTED PERSONS

In accordance with 11th Circuit Rule 26.1, undersigned counsel for Skanska USA Civil Southeast, Inc. certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.    Alston & Bird LLP, Attorneys for Skanska-Granite-Lane, a Joint Venture.

2.    Arch Insurance Company (NASDAQ: ACGL).

3.    Baker & Hostetler LLP, Attorneys for The Lane Construction Corporation and Webuild S.p.A.

4.    Brodsky, Jerry P., Attorney for Skanska USA Civil Southeast, Inc.

5.    Dalton, Jr., Roy B., U.S. District Judge for the Middle District of Florida.

6.    Dyl, Shelby L., Attorney for The Lane Construction Corporation and Webuild S.p.A.

7.    Fombrun, Charles E., Attorney for Skanska USA Civil Southeast, Inc.

8.    Frederick, David C., Attorney for The Lane Construction Corporation and Webuild S.p.A.

9.    Gans, Jeffrey, Attorney for The Lane Construction Corporation and Webuild S.p.A.

10.   Granite Construction Company, Appellee.

11.   Granite Construction, Inc. (NYSE: GVA) (parent of Granite Construction Company).

12.   Hanover, John, Attorney for Skanska-Granite-Lane, a Joint Venture.

13.   Henner & Scarbrough, LLP, Attorneys for Granite Construction Company.

14.   Henner, Joseph, Attorney for Granite Construction Company.

15.   Hornreich, Michael A., Attorney for Skanska-Granite-Lane, a Joint Venture.

16.   Irick, Daniel C., U.S. Magistrate Judge for the Middle District of Florida.

17.   Kapetanovic, Kathleen, Attorney for Granite Construction Company.

18.   Kellogg, Hansen, Todd, Figel, & Frederick PLLC, Attorneys for The Lane Construction Corporation and Webuild S.p.A.

19.   Lane Industries, Inc. (parent of The Lane Construction Corporation).

20.   McNamara, Michael S., Attorney for The Lane Construction Corporation and Webuild S.p.A.

21.   Meller, Bruce D., Attorney for Skanska USA Civil Southeast, Inc.

22.   Okwara, Arabella, Attorney for Skanska-Granite-Lane, a Joint Venture.

23.   Olsen, Christopher J., Attorney for Granite Construction Company.

24.   Peckar & Abramson, P.C., Attorneys for Skanska USA Civil Southeast, Inc.

25. Pillsbury Winthrop Shaw Pittman, LLP, Attorneys for The Lane Construction Corporation and Webuild S.p.A.

26. Salini Impregilo S.p.A. n/k/a Webuild S.p.A

27. Scarbrough, Tyler, Attorney for Granite Construction Company

28. Schiffman, Kelley, Attorney for The Lane Construction Corporation and Webuild S.p.A.

29. Shanlever, Michael H., Attorney for Skanska-Granite-Lane, Joint Venture

30. Skanska AB, a Swedish corporation (NASDAQ OMX Stockholm "SKA B") (parent of Skanska, Inc.).

31. Skanska Kraft AB, a Swedish corporation (holding company)

32. Skanska, Inc. (parent corporation of Skanska USA, Inc.).

33. Skanska USA, Inc. (parent of Skanska USA Civil, Inc.).

34. Skanska USA Civil, Inc. (parent of Skanska USA Civil Southeast, Inc.).

35. Skanska USA Civil Southeast, Inc., Appellee.

36. Skanska-Granite-Lane, Joint Venture, Appellee.

37. Stein, Gary M., Attorney for Skanska USA Civil Southeast, Inc.

38. The Lane Construction Corporation, Appellant.

39. Thelen, LLP, Attorney for the Lane Construction Corporation and Webuild S.p.A.

40.	Thielhelm, Jr., Robert W., Attorney for The Lane Construction Corporation and Webuild S.p.A.

41.	Webuild S.p.A., an Italian corporation ("WBD.MI"), Appellant (whole owner of Webuild US Holdings, Inc.).

42.	Webuild US Holdings, Inc. (whole owner of Lane Industries, Inc.).

43.	Weinberg Wheeler Hudgens, Gunn & Dial, LLC, Attorneys for Skanska-Granite-Lane, a Joint Venture

44.	XL Specialty Insurance Company

45.	Zingone, Gerald, Attorney for The Lane Construction Corporation and Webuild S.p.A.

# CORPORATE DISCLOSURE STATEMENT

Skanska USA Civil Southeast, Inc. is a wholly owned subsidiary of Skanska

USA Civil, Inc.

Dated: December 23, 2024

By:    */s/ Gary M. Stein*
PECKAR & ABRAMSON, P.C.
One Southeast Third Avenue, Suite 2000
Miami, FL 33131
Ph: 305-358-2600
Fax: 305-375-0328
GARY M. STEIN
Florida Bar No. 378933
gstein@pecklaw.com
JERRY P. BRODSKY
Florida Bar. No. 948561
jbrodsky@pecklaw.com
CHARLES E. FOMBRUN
Florida Bar No. 105133
cfombrun@pecklaw.com
NADIA ENNAJI
Florida Bar No.: 1002738
nennaji@pecklaw.com
*Attorneys for Skanska USA Civil
Southeast, Inc.*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee, Skanska USA Civil Southeast, Inc. ("Skanska_SE") respectfully requests oral argument. While Skanska_SE submits that the District Court's findings of fact and conclusions of law are clear and overwhelmingly supported by evidence and Florida law, the Court may benefit from an oral discussion of the extensive factual record, the legal issues, and the applicable precedent.

**TABLE OF CONTENTS**

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS .....................................................C-1

CORPORATE DISCLOSURE STATEMENT .........................................................5

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

STATEMENT REGARDING ADOPTION OF BRIEFS OF  OTHER
     PARTIES ....................................................................................................... xi

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE..................................................................................2

STATEMENT OF FACTS ........................................................................................6

     A.     Lane's Knowledge of Skanska_SE's Relationship with
             I4MP..............................................................................................6

     B.     Webuild's Use of its Conflict Allegation as a Pretext for
             this Lawsuit and to Avoid Capital Contributions ......................7

     C.     Termination Rights Under the Relevant Contracts...................11

             **i.**     **The DBA and the DSC as a basis for
                         termination**.................................................................12

             **ii.**     **The chances of I4MP passing SGL's request for
                         termination to FDOT**.....................................................14

             **iii.**     **The CA and the chances of FDOT accepting the
                         request for termination**.................................................16

     D.     The Potentially Catastrophic Consequences to SGL of a
             Conditional Notice of Termination..........................................17

     E.     SA22 and Its Benefits .............................................................19

**TABLE OF CONTENTS**

**Page(s)**

F.     There Is No Evidence of Self-Dealing by Skanska_SE............20

     **i.**    **Lane's allegations against Subin and DiPaolo**...........22
     **ii.**   **Lane's allegations against Kennedy**...........................22
     **iii.**  **Skanska AB was not financially incentivized to refuse termination**..........................................................25
     **iv.**  **Granite had the same opinion about termination as Skanska_SE**........................25

G.     Lane Did Not Establish Causation or Damages ......................26

H.     Lane Repudiated Its Obligation to Pay Capital Calls in January 2021 and Thereafter  Skanska_SE and Granite Exclusively Financed SGL's Losses........................................27

STATEMENT OF THE STANDARD OF REVIEW ............................................27

SUMMARY OF THE ARGUMENT ....................................................................29

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................32

POINT I.................................................................................................................32

THE DISTRICT COURT CORRECTLY RULED THAT LANE DID NOT PROVE THE ELEMENTS OF ITS BREACH OF FIDUCIARY DUTY CLAIM ..........................................................32

     A.     Skanska_SE Did Not Breach Its Duty Of Loyalty To Lane........................................................................................32

          i.    A breach cannot be found as there has been no harm to SGL or Lane ......................................................32

          ii.   A breach of the duty of loyalty under FRUPA §620.8404(2)(b) cannot be predicated upon the relationship between Skanska_SE and Skanska_ID ......35

          iii.  Skanska_SE's fiduciary duty is found in the JVA, not FRUPA .................................................................38

**TABLE OF CONTENTS**

**Page(s)**

      iv.     Skanska_SE did not fail to disclose any information ...................................................... 39

      v.      The District Court correctly found that, to the extent there was a breach of Skanska SE's fiduciary duty, it had been ratified ................................ 40

   B.    The District Court Correctly Ruled That Lane Did Not Establish The Fact, Or Amount, Of Damages .......................... 42

POINT II ............................................................................................... 46

THIS COURT SHOULD NOT REACH THE MERITS OF LANE'S ARGUMENT BECAUSE IT WAS NOT RAISED BELOW ............ 46

POINT III .............................................................................................. 49

LANE IS NOT ENTITLED TO EQUITABLE RELIEF .............................. 49

   A.    Lane Is Not Entitled to Disgorgement ...................................... 49
   B.    There Are No Grounds for Shifting Attorneys' Fees ............... 50

   C.    To The Extent Lane and Webuild Have Not Forfeited Their Challenge to the District Court's Award of Prejudgment Interest, There are No Grounds for Denying Skanska SE Prejudgment Interest .............................................. 51

   D.    There are No Grounds For Awarding Nominal Damages ........ 54

   E.    There are No Grounds for a Declaratory Judgment .................. 54

   F.    Injunctive Relief is Inappropriate ............................................. 55

POINT IV .............................................................................................. 56

iii

## TABLE OF CONTENTS

**Page(s)**

THE DISTRICT COURT'S DECISION GRANTING SUMMARY
JUDGMENT WAS ENTIRELY PROPER ......................................... 56

CONCLUSION ............................................................................. 56

CERTIFICATE OF COMPLIANCE .............................................. 57

CERTIFICATE OF SERVICE ...................................................... 58

# TABLE OF CITATIONS

**PAGE(S)**

**CASES**

*Access Now, Inc. v. Southwest Airlines Co.*,
  385 F.3D 1324 (11TH CIR. 2004) ............................................................ 47, 48, 49

*Alloy v. Wills Fam. Tr.*,
  179 MD. APP. 255 (2008) ............................................................................... 39, 40

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
  432 F. SUPP. 2D 1319 (S.D. FLA. 2006) ......................................................... 42, 43

*Ameritox, Ltd. v. Millennium Lab'ys, Inc.*,
  2014 WL 1456347 (M.D. FLA. APR. 14, 2014) ..................................................... 49

*Archer v. Med. Protective Co. Of Fort Wayne, Indiana*,
  2004 WL 1194455 (N.D. TEX. 2004) ................................................................... 42

*Argonaut Ins. Co. v. May Plumbing Co.*,
  474 SO. 2D 212 (FLA. 1985) ............................................................................... 53

*Arizona Chem. Co., Llc v. Mohawk Indus.*, Inc.,
  197 SO. 3D 99 (FLA. DIST. CT. APP. 2016) .......................................................... 52

*Aycock v. R.J. Reynolds Tobacco Co.*,
  769 F.3D 1063 (11TH CIR. 2014) ........................................................................ 43

*Barber V. Wonderland Greyhound Park*,
  656 SO. 2D 961 (FLA. DIST. CT. APP. 1995) ........................................................ 55

*Bass Venture Corp. V. Devom, Llc*,
  342 SO. 3D 821 (FLA. DIST. CT. APP. 2022) ........................................................ 45

*Bitterman V. Bitterman*,
  714 SO. 2D 356 (FLA. 1998) ............................................................................... 50

*Blasland, Bouck & Lee, Inc. V. City Of N. Miami*,
  283 F.3D 1286 (11TH CIR. 2002) ........................................................................ 52

*Britt Green Trucking, Inc. V. Fedex Nat., Ltl, Inc.*,
  2014 WL 3417569 (M.D. FLA. JULY 14, 2014) ................................................. 46

*Carolina Pres. Partners, Inc. V. Wolf Arbin Weinhold*,
  414 B.R. 754 (M.D. FLA. 2009) ............................................... 34, 36, 37

*Cooper V. Harris*,
  581 U.S. 285, 137 S. CT. 1455, 197 L. ED. 2D 837 (2017) .......................... 27, 28

*Enea V. Superior Ct.*,
  132 CAL. APP. 4TH 1559 (2005) ....................................................... 34

*FCCI Com. Ins. Co. V. Empire Indem. Ins. Co.*,
  250 SO. 3D 858 (FLA. DIST. CT. APP. 2018) ...................................... 51

*G.M. Brod & Co. V. U.S. Home Corp.*,
  759 F.2D 1526 (11TH CIR. 1985) ..................................................... 45

*Gemini Ins. Co. V. Zurich Am. Ins. Co.*,
  119 F.4TH 1296 (11TH CIR. 2024) .................................................. 53

*Gochnauer V. A.G. Edwards & Sons, Inc.*,
  810 F.2D 1042 (11TH CIR. 1987) ..................................................... 28

*Gooding V. Univ. Hosp. Bldg., Inc.*,
  445 SO. 2D 1015 (FLA. 1984) ......................................................... 43

*Gracey V. Eaker*,
  837 SO. 2D 348 (2002) ................................................................... 42

*Gratz V. Claughton*,
  187 F.2D 46 (2D CIR. 1951) ............................................................ 46

*In Re Chira*,
  353 B.R. 693 (BANKR. S.D. FLA. 2006) ........................................ 32

*In Re Demasi*,
  542 B.R. 13 (BANKR. M.D. FLA. 2015) .......................................... 35

*In Re Palm Ave. Partners, Llc*,
  576 B.R. 239 (BANKR. M.D. FLA. 2017) ........................................ 40

*In Re Textainer P'ship Sec. Litig.*,
  2005 WL 3801596 (N.D. CAL. DEC. 12, 2005) ................................................... 34

*In Re Wagner*,
  2024 WL 4142990 (11TH CIR. SEPT. 11, 2024) ............................................... 27

*In Re: Samuel Edward Cooley, Debtor, Datex Inc., Appellant, V. Samuel Edward Cooley, Appellee.*,
  2024 WL 4605229 (M.D. FLA. OCT. 29, 2024) ................................................. 54

*J. Truett Payne Co. V. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ...................................................................................... 45

*Kaplan V. Nautilus Ins. Co.*,
  2019 WL 12265654 (S.D. FLA. 2019) .............................................................. 44

*Land & Sea Petroleum Holdings, Inc. V. Leavitt*,
  321 SO. 3D 810 (FLA. DIST. CT. APP. 2021) ................................................... 54

*Landstar Glob. Logistics, Inc. V. Haskins*,
  2012 WL 39514 (M.D. FLA. JAN. 9, 2012) ....................................................... 38

*Larmoyeux V. Montgomery*,
  963 SO. 2D 813 (FLA. DIST. CT. APP. 2007) ................................................... 50

*Litman V. Prudential-Bache Properties, Inc.*,
  1993 WL 5922 (DEL. CH. 1993) ..................................................................... 41

*Manning Ex Rel. Manning V. Sch. Bd. Of Hillsborough Cnty., Fla.*,
  244 F.3D 927 (11TH CIR. 2001) ..................................................................... 28

*Mortg. Now, Inc. V. Guaranteed Home Mortg. Co.*,
  545 F. APP'X 809 (11TH CIR. 2013) ................................................................ 45

*Nagel V. Glob. Growth Holdings, Inc.*,
  2024 WL 1701142 (M.D. FLA. 2024) ............................................................... 50

*Nat'l Fire Ins. Co. Of Hartford V. Fortune Constr. Co.*,
  233 F. APP'X 890 (11TH CIR. 2007) ................................................................ 53

*Ne. Nat. Energy Llc V. Pachira Energy Llc*,
  243 W. VA. 362, 844 S.E.2D 133 (2020) ......................................................... 55

vii

*Nolan V. Virginia Inv. Fund Ltd. P'ship,
  833 SO. 2D 853 (FLA. 3D DCA 2002) ................................................................. 41

*Nview Health, Inc. V. David V.,
  2022 WL 16923585 (M.D. FLA. NOV. 14, 2022) ................................................. 54

Old Park Inv., Inc. V. The Vessel "Leda",
  469 F. SUPP. 2D 1201 (S.D. FLA. 2006) ............................................................. 44

Pods Enterprises, Llc V. U-Haul Int'l, Inc.,
  126 F. SUPP. 3D 1263 (M.D. FLA. 2015) ........................................................... 52

Quinn V. Phipps,
  113 SO. 419 (1927) ............................................................................................. 45

Robinson V. Shell Oil Co.,
  519 U.S. 337, 117 S. CT. 843, 136 L. ED. 2D 808 (1997) ................................... 33

Rodriguez V. Jacoby & Meyers, Llp,
  6 N.Y.S.3D 240 (1ST DEPT. 2015) ..................................................................... 41

*S.E.C. V. Monterosso,
  557 F. APP'X 917 (11TH CIR. 2014) ................................................................... 49

Saeme V. Levine,
  2012 WL 13134605 (S.D. FLA. SEPT. 13, 2012) ................................................ 45

*SEB S.A. V. Sunbeam Corp.,
  476 F.3D 1317 (11TH CIR. 2007) ....................................................................... 53

*Sierra Equity Grp., Inc. V. White Oak Equity Partners, LLC,
  650 F. SUPP. 2D 1213 (S.D. FLA. 2009) ............................................................. 54

*Sonwalkar V. St. Luke's Sugar Land P'ship, L.L.P.,
  394 S.W.3D 186 (TEX. APP. 2012) ..................................................................... 55

Stewart Agency, Inc. V. Arrigo Enterprises, Inc.,
  266 SO. 3D 207 (FLA. DIST. CT. APP. 2019) ..................................................... 49

*Storfer V. Guarantee Tr. Life Ins. Co.,
  666 F.3D 1277 (11TH CIR. 2012) ....................................................................... 45

*Twyman V. Roell*,
   123 FLA. 2 (1936)........................................................................... 43

*U.S. Commodity Futures Trading Comm'n V. S. Tr. Metals, Inc.*,
   894 F.3D 1313 (11TH CIR. 2018)................................................... 28

*\*Wallace V. Odham*,
   579 SO. 2D 171 (FLA. 5TH DCA 1991)........................................... 40

*\*Welch V. Via Christi Health Partners, Inc.*,
   281 KAN. 732, 133 P.3D 122 (2006) ................................. 32, 33, 34, 37

*Whitney V. R.J. Reynolds Tobacco Co.*,
   157 SO. 3D 309 (FLA. 1ST DCA 2014) ............................................. 44

*Williams V. Stanford*,
   977 SO. 2D 722 (FLA. DIST. CT. APP. 2008)..................................... 35

*Woods V. City Nat. Bank & Tr. Co. Of Chicago*,
   312 U.S. 262 (1941) .................................................................. 36, 45

## STATUTES

FLA. STAT. §620.8103 ..................................................................... 38, 41

FLA. STAT. §620.8403(3)(B) ................................................................ 39

## RULES

11TH CIR. R. 28-1(F).............................................. 10, 1, 2, 27, 28, 32, 51

FED. R. APP. P. 32(A)(5)...................................................................... 57

FED. R. APP. P. 32(A)(6)...................................................................... 57

FED. R. APP. P. 32(A)(7)(B) ................................................................ 57

FED. R. APP. P. 32(F)........................................................................... 57

FEDERAL RULE OF APPELLATE PROCEDURE 28(I)................................. 10

## OTHER AUTHORITIES

FRUPA§620.8404(2)(B)……………………1,5,29,30,31,32,33,34,35,37,38,47,50

Harmonized Uniform Partnership Act ("HUPA"), §409(b)(2)…………………33

Restatement (Second) Of Agency, §389........................................................ 36, 41

*The Disclosure Obligations Of Partners Inter Se Under The Revised Uniform Partnership Act Of 1994: Is The Contractarian Revolution Failing?,*
36 WM. & MARY L. REV. 1559 (1995) ........................................................... 39

Uniform Partnership Act ("Hupa"), §409(B)(2).......................................... 33, 36, 38

**STATEMENT REGARDING ADOPTION OF BRIEFS OF
OTHER PARTIES**

Pursuant to Federal Rule of Appellate Procedure 28(i) and 11th Cir. R. 28-1(f), Appellee Skanska_SE adopts the entirety of co-Appellee, Granite Construction Company's ("Granite") Brief. Specifically, Skanska_SE adopts Granite's Introduction, Statement of Subject Matter and Appellate Jurisdiction, Statement of the Issues, Statement of the Case, Standard of Review, Summary of Argument, and Argument sections of Granite's Brief as it relates to the appeal of the District Court's summary judgment order and award of prejudgment interest in the final judgment in Skanska_SE's favor.

**STATEMENT OF THE ISSUES**

1.      Whether this Court can find that Skanska_SE is liable to Lane Construction Corp ("Lane") under the Florida Revised Uniform Partnership Act ("FRUPA") despite the District Court ruling, after trial, that Skanska_SE acted in the best interest of Skanska-Granite-Lane, Joint Venture ("SGL"), the joint venture consisting of Skanska-SE, Lane and Granite, in light of mounting losses and financial exposure on the Project.

2.      Whether this Court can consider Lane's argument that Skanska_SE breached its duty of loyalty under FRUPA §620.8404(2)(b) where Lane could have raised this argument below but failed to do so.

3.      Whether Skanska_SE can be liable to Lane despite the District Court ruling, after trial, that Lane did not prove that Skanska_SE's actions caused it or SGL any damages.

4.      Whether there is any basis for Lane to recover equitable relief or for a shifting of attorney's fees.

5.      As to the appeal of the District Court's summary judgment order in Skanska_SE's favor and the prejudgment interest awarded to Skanska_SE in the final judgment, under Federal Appellate Rule 28(i) and 11th Cir. R. 28-1(f), Skanska_SE adopts co-appellee, Granite's, Statement of the Issues identified in p. 4 of Granite's Brief.

1

**STATEMENT OF THE CASE**

While Lane's theories have morphed throughout this litigation, the District Court has properly rejected them all. At trial, the District Court evaluated the testimony of 23 witnesses and considered 629 exhibits, resulting in a 40-page opinion wholly rejecting Lane's claim that Skanska_SE protected the interests of non-party Skanska Infrastructure Development, Inc. ("Skanska_ID") at the expense of Lane and the Skanska Granite Lane Joint Venture ("SGL") by accepting Supplemental Agreement 22 ("SA22") with Florida Department of Transportation ("FDOT"), as owner, and I-4 Mobility Partners OpCo, LLC ("I4MP"), as concessionaire, and not submitting an "Equivalent Claim Notice" to I4MP pursuing termination of SGL's Design Build Agreement ("DBA") with I4MP.

Indeed, the District Court declared, "[s]imply put, the evidence at trial was overwhelming that Skanska_SE acted in SGL's and Lane's best interest in rejecting the termination option" (JA4637-4638); such rejection was a "no-brainer, not a breach;" (*Id.*) and pursuing, or even threatening, termination "likely would have been ruinous for all involved" and SA22 was a "very favorable deal for the partners." (JA4606-4607).

Specifically, the evidence demonstrated that Skanska_SE and Granite, separately, made good faith, exhaustingly analyzed decisions to pursue SA22 rather than termination, actual or threatened, in the face of mounting losses and potential

default. This included, without limitation, reasonably relying upon the business judgment of multiple company executives and legal opinions from: SGL's outside legal counsel (Ben Subin and Monte Starr with Holland & Knight ("H&K") and Brad Copenhaver and Rob Vezina with Vezina Lawrence & Piscitelli ("VLP")); Skanska_SE's outside counsel (Bruce Meller with Peckar & Abramson); and Skanska_SE's in-house counsel (Michael DiPaolo and Steve Lunsford).

Indeed, Lane's unfounded termination argument was, as the District Court agreed, a pretext for Salini Impregilo S.p.A. n/k/a Webuild, S.p.A., Inc. ("Webuild"), Lane's parent and guarantor, to stop making capital calls and to sue Skanska_SE based upon whatever legal theory it could invoke. Webuild had become Lane's parent company after commencement of the Project through a secret transaction, not authorized by the Joint Venture Agreement ("JVA"), ominously portending things to come. Webuild's and Lane's internal documents reveal a plan by Webuild to sue Skanska_SE as early as February 2018, months before they fabricated their conflict-of-interest theory, and to direct Lane to delay making capital contributions while its lawyers formulated legal theories to support its actions. Lane then participated in the SA22 negotiation with FDOT, while withholding the "termination option," and ultimately agreed, in writing, to accept SA22's salient terms. In October 2019, as the deal with FDOT was being finalized, Lane, at Webuild's behest, suddenly reversed course demanding that SGL pursue termination.

3

The District Court also accepted Skanska_SE's argument that Lane did not prove Skanska_SE's relationship with I4MP caused Lane or SGL damage. In its pleading and throughout 2+ years of litigation, Lane argued that SGL should have pursued termination to stop incurring losses on the Project. However, Lane could not overcome the uncontroverted evidence establishing that whether to terminate the DBA was up to I4MP and FDOT, not SGL, with both parties having several options regarding its response to a notice for termination. Indeed, as the District Court found, Lane made a "damning concession," defeating its claim of causation, that "no one knows exactly what would have happened had the JV made a demand for termination." (JA4637).

Lane, apparently recognizing these issues, shifted its position at trial to argue that Skanska_SE should have blindly counted on I4MP **not** pursuing termination upon receipt of SGL's demand but, rather, independently negotiating some sort of relief with SGL. Lane claims, incredibly, that the District Court cited no evidence that this "carried any substantial risks for SGL." (Brief[1], p. 41). The District Court actually cited to substantial evidence leading it to conclude that "the JV's outside attorneys, Lane's fellow minority partner, and its own CEO/Chairman all acknowledged that pursuing or **even threatening** termination was severely

---

[1] Appellants, *Lane v. Skanska* et al., filed, No. 24-12638 & 24-12639 (11th Cir. Oct. 23, 2024), Doc. 32 ("Brief").

financially and reputationally risky for everyone and the outcome was far from guaranteed." (JA4636). (emphasis added).

As a legal matter, Lane now argues that Skanska_SE should be liable under FRUPA despite the clear finding that Skanska_SE represented SGL's best interests in its dealing with I4MP and FDOT. Such an argument, first raised on appeal, is a complete misinterpretation of FRUPA and would lead to an absurd result and jeopardize the public-private partnership project ("P3") delivery method as it is currently used throughout the United States.

As to Lane and Webuild's appeal of the summary judgment order in Skanska_SE's favor and the prejudgment interest awarded to Skanska_SE in the final judgment, Skanska_SE adopts co-appellee, Granite's, Introduction and Statement of the Case on pp.1-24 of Granite's Brief. As it relates specifically to Skanska_SE's claims, Lane's principal challenge of the summary judgment order is the same as it is against Granite. Skanska_SE sought a single award of damages against Lane and Webuild in the amount of $48,978,747.09 (plus interest) on its claims for breach of contract, indemnification, and breach of guaranty, which is the amount Skanska SE loaned or advanced on Lane's behalf when Lane stopped making capital calls. (JSA1494-JSA1495)[2]. Articles 3 and 8 of the JVA, under which

---

[2] Lane did not object to this exhibit at trial.

Skanska_SE brought its claims against Lane, are similarly applicable remedy-granting provisions to Skanska_SE as a party to the JVA.

## STATEMENT OF FACTS

### A.    Lane's Knowledge of Skanska_SE's Relationship with I4MP

Before entering into the JVA, Lane knew all about the relationship of which it now complains, including that: Skanska AB was both Skanska_SE's and Skanska_ID's "ultimate parent"; Skanska_ID was part of I4MP; and Skanska_ID would receive a portion of I4MP's Availability Payments. (JA2691-2694; JA3074-JA3076; JA3834; JA4174; JA4609). Indeed, the District Court found that Lane's "cries of conflict ring hollow[]" because:

> not only did Lane know about the relationship between Skanska_SE and Skanska ID before the venture, but also, Lane had worked with Skanska on P3s before *and* had been both majority and minority partner before, so its eyes were wide open going in. Lane knew how the interplay between majority and minority partners in the JV would work, and it knew how the interplay between the JV, the concessionaire, and the state would work. And Lane had its own boots on the ground at the Project every day throughout.[3]

---

[3] Concerning Lane's assertion that the Skanska entities operated as "One Skanska," multiple witnesses testified that this was a marketing concept projecting Skanska as having multiple competencies. (JA3621; JA3903-3904). Concerning the issue of a firewall, Lane does not cite any legal or contractual requirement of same and Kennedy testified that different people were responsible for managing each Skanska entity. (JA3910-3911).

(JA4610; JA4636). Ignacio Botella, Webuild's General Manager, and Robert Alger, Lane's CEO, also acknowledged that joint venturers are commonly related to concessionaires on Public-Private Partnerships ("P3"). (JA2893-JA2894; JA3476; JA3839; JA4610; JSA383).

Based upon such knowledge, Lane could have negotiated terms in the JVA limiting Skanska_SE's decision-making for SGL, including for the circumstances about which it now complains. (JA1091-1128). Instead, Lane agreed to designate Skanska_SE as SGL's "Managing Party" with authority to act if there was no unanimity between the partners regarding a critical decision. (JA1036-JA1037; JA1097, §5.1; JA1098, §5.4). As a result, Skanska_SE was authorized to break the tie between Granite and Lane regarding termination, perhaps the most critical decision SGL could face. (JA1097, §5.1; JA1098, §5.4; JSA748-JSA749; JSA751; JSA753-JSA754).

**B.     Webuild's Use of its Conflict Allegation as a Pretext for this Lawsuit and to Avoid Capital Contributions**

During the Project, Webuild acquired Lane and its original guarantor. (JA1037-JA1038). Thereafter, Webuild became Lane's new parent guarantor, required to cure Lane's material breaches and defaults under the JVA and to indemnify and hold Skanska_SE harmless from and against any loss sustained as a result. (JA1037-JA1038; JSA632-JSA638).

7

Webuild's plan to sue Skanska_SE through Lane, to enable Lane to stop paying capital and to find a way to recover its Project losses, started as early as February 2018, months before Lane formulated its conflict theory, and continued throughout the spring/summer of 2018 as exemplified by the following[4]:

- February 8, 2018, Webuild/Lane email asking if there were grounds to sue Skanska_SE and stating that Mr. Salini was solely interested in how Lane was going to recover their losses and "what ass" they were "kicking." (JA2860; JSA846).

- July 1, 2018 internal Lane/Webuild email advising that

  Mr. Salini has injected himself personally into this. He wants a top USA lawyer to look into this matter. I suggest you check what the position of Granite is on this. Salini is not afraid to pick a fight, no matter the consequences, and the position of Granite on this is fundamental.

(JA2861-JA2862; JSA862-JSA864).

- July 6, 2018 memorandum by Seth Firmender (Lane's General Counsel), "Options and Legal Considerations for Relief Against Skanska," advising Lane personnel not to make capital contributions, but to delay while the lawyers devised legal theories, and suggesting they send a letter to Skanska_SE vaguely objecting to

---

[4] Additional evidence of Lane's scheme includes JA2860-JA2863; JA4003-JA4006; JSA547-JSA553; JSA555-JSA561; JSA866-JSA868; JSA1236-JSA1237; and JSA1147-JSA1148;.

the capital calls "for the reasons previously stated." (JA2864-JA2867; JSA1152-JSA1161).

Lane began pushing termination with SGL in September/October 2018 because it could not comply with its capital obligations. (JSA870-JSA871). However, on October 19, 2018, the three members of SGL and their counsel participated in a meeting regarding the "termination option" at which all members, including Lane by its CEO, Alger, agreed SGL would pursue commercial discussions with FDOT and H&K would "undertake additional review of the relevant contract provisions and … analyze its termination issue further and report back to the JV executive committee with its findings and opinions …." (JA3149-JA3151; JSA640-JSA726; JSA876-JSA877; JSA1238-JSA1240). Skanska SE, as Managing Partner, through Donald Fusco, Skanska USA Civil's President/CEO, led the SA22 negotiations for SGL. (JA2848). Alger testified he trusted and liked Fusco, who was a "stand-up guy." (JA2848; JA3517–JA3518; JSA417; JSA420; JSA1125-JSA1131). Alger and others also testified the Presidents/CEOs of SGL's members and project staff worked shoulder-to-shoulder on the SA22 settlement. (JA2838-JA2859; JA3525-JA3545; JA4107-JA4109; JA4135).[5] Indeed, the District Court determined, "all three partners were intimately involved in negotiating SA22";

---

[5] The fact that SGL negotiated SA22 directly with FDOT, not through I4MP, is of no moment given Lane's participation and the back-to-back nature of I4MP's obligations with respect to SGL's claims that led to SA22. (JA1189 § 3.1.1.4).

"Lane was not left out of the loop during the negotiations" and Lane's and Skanska_SE's representatives had a "good relationship" during this time. (JA4621; JA4629-4630).

Fusco told Alger he did not want to threaten termination before meeting with FDOT, and Alger said he trusted Fusco to use his best judgment but, if settlement could not be reached, termination was still an option. (JA2839-JA2840; JA4164-JA4165; JSA894-JSA896; JSA906-JSA914; JSA1125-JSA1131). Other Lane executives said the same about waiting to threaten termination in contemporaneous emails. (JSA728-JSA732; JSA873-JSA874; JSA900-JSA904; JA2841-JA2842).

By the summer of 2019, Lane was still not timely making capital contributions and Alger was telling Webuild this is a "[d]angerous game we are playing here," referring to Lane not making contributions and inventing claims against Skanska_SE. (JA2789-JA2792; JSA916).

On August 8, 2019, Alger texted representatives of Skanska_SE and Granite saying the parties had "a handshake deal [on SA21/22 which] now just needs to be put to paper." (JA2857-2858; JSA745). This was based on a deal in which FDOT agreed to pay SGL $125 million with SGL reserving rights on its substantial future claims, as Webuild had demanded. (*Id.;* JA2854-JA2855; JSA742). Then, on August 13, 2019, Alger informed Skanska_SE, for the first time, that he did not have

10

authority to agree to SA22, despite being Lane's CEO/Chairman and having been intimately involved with the negotiations. (JA2858-JA2859; JA4630-JA4631).

On January 22, 2021, Lane filed its Complaint and informed Skanska_SE that Lane "will not make any further capital contributions starting with the January 2021 Cash Call." (JSA1172-JSA1233).

## C.    Termination Rights Under the Relevant Contracts

In late 2017, in light of mounting losses, SGL began investigating potential avenues of relief, including termination. (JA3311; JA4025). It was Lane's position until trial, that SGL should have demanded termination, as evidenced by Lane's Complaint ("[a]t a critical moment, SGL could have triggered a right to exit the Project, which would have cut-off and stemmed the joint venture's losses. Lane directed Skanska SE to act in the best interests of SGL by triggering that right, but Skanska SE refused to do so…" (JA60); Lane's expert report by Kevin Dennis (Lane instructed him to assume "that the Concession Agreement would have been terminated in late 2018, with an effective termination date of December 31, 2018" (JA3006-JA3010; JA3016-JA3017; JA3021-JA3025; JA3031; JA4544; JA4628-4629; JSA494; JSA1096); Lane's October 26, 2018 communication ("[b]y exercising termination, SGL can stop performance and avoid projected future performance losses" (JA4643)); Lane's counsel argument at trial that "there was a possibility of terminating the project and walking away without suffering [] losses"

11

(i.e. JA2548); and testimony that at the October 19, 2018 meeting, Lane's counsel was proposing termination. (JA3708-JA3709; JA3958).

During trial, Lane changed its position and began arguing that it wanted to bluff, by threatening, not actually pursuing, termination. While this evidences the disingenuousness of Lane's argument, it is irrelevant because the District Court found, based on the evidence below, that SGL could not have even threatened termination without substantial risk.

### i.    *The DBA and the DSC as a basis for termination*

It is undisputed that, under the DBA, §20.2, which is titled "No Termination Right for Extended Relief Event," SGL had no termination rights for delay. (JA1335). Lane's theory is that, under the DBA, §2.4 of Appendix 23, SGL could have submitted an "Equivalent Claim Notice" to I4MP requesting it seek FDOT's approval to terminate for the delay asserted in SGL's Drilled Shaft Claim ("DSC"). (JA2240-JA2246; JA1129-JA1133; JSA565-JSA592; JSA850-JSA860; JSA879-JSA892). However, SGL had already submitted the certified DSC for compensation, and under the DBA, §10.1.5.6, it had no contractual authority to change its request to termination. (JA1171; JA1262). Nor could SGL have withdrawn and resubmitted it without violating the written notice requirement under §10.1.5.1. (JA1171; JA1258-1259).

Furthermore, as Alger testified, "there's no question" SGL "absolutely ha[d] to prove" 180+ days of delay for 14MP to have a termination right under its CA and it had not been proven as of October 26, 2018, when Lane began advocating for (but not demanding) termination (JA2808; JA2831), or even by the time SA22 was signed on April 10, 2020. (JSA640-JSA726; JSA1024-JSA1079). Additionally, in 2018, the Project was still almost 4 years from Substantial Completion (JA4099) and, since mitigation of delays was required under the DBA and there were possible concurrent delays, which were contractually excluded from the 180 days, SGL could not determine whether it would incur the requisite delay. (JA4622).

H&K, SGL's outside counsel, analyzed this issue and prepared memoranda warning of exceptional risk in utilizing the DSC as a basis for termination. For instance, twice in the spring/summer of 2018 (JA1136; JA1154-JA1155), H&K informed SGL that to make a demand for I4MP to terminate, it would have to be able to prove clear entitlement to 180+ days of relief.[6] In a November 2, 2018 memorandum (JSA532-JSA545), H&K stated that SGL did not have such "clear entitlement to Relief Event Delays in excess of 180 days" and, without that, it would be "exceptionally risky" and "reckless for SGL to demand that 14MP serve a

---

[6] Lane's reliance on a few isolated statements in these memoranda is unavailing in light of the District Court's findings that H&K consistently warned SGL of problems with termination. (JA4618).

conditional notice of termination" on FDOT. H&K reiterated these concerns in two memoranda in the winter of 2019-2020. (JSA565-JSA592; JSA594-JSA623; JSA628-JSA630)

Likewise, VLP, SGL's other outside counsel, provided a June 11, 2018 memorandum (JA1129-JA1133), stating that Substantial Completion had to have actually been delayed by 180+ days for the right to request termination to arise.

Meller, DiPaolo, and Lunsford also expressed contemporaneous concern with termination, including SGL's lack of proof of 180+ days of delay, and Lane's reliance upon a scrivener's error in the CA which, as described by the District Court, "introduced one more element of risk to the partners' consideration of the already otherwise risky termination option." (JA3165-3169; JA3322-3323; JA3325-JA3326; JA3329-JA3332; JA3941-JA3943; JA3946-JA3958, JA4623; JSA1162-JSA1171).

### ii.    *The chances of I4MP passing SGL's request for termination to FDOT*

Even if Skanska_SE could have properly requested termination, there was a question at trial as to what I4MP's response would be, as it was not required to pass the request to FDOT under the DBA (Appendix 23, §2.6.3.3) or CA (§§20.2.1.1-20.2.1.4) (JA2050; JA2202-JA2203). The District Court determined that "I4MP likely would not have terminated the Concessionaire Agreement ("CA") with FDOT even if SGL demanded it" as "John Laing – the only entity that would have voted,

14

given that Skanska ID was contractually required to recuse itself if SGL demanded termination[7] – maintained that SGL had no right to terminate." (JA4627-JA4628; JA2351; JSA756-JSA844; JSA1150). Despite having previously argued otherwise, Lane now agrees with the District Court, stating in its brief that it was "rather unlikely" that I4MP would choose to threaten or pursue termination with FDOT. (Brief, p. 41).

If I4MP chose not to pursue termination, it would not immediately be obligated to pay SGL Equivalent Project Relief, as Lane contends. Rather, SGL would have to continue performance – still incurring cash flow losses – while the dispute was resolved under the DBA Dispute Resolution Procedure, which could potentially take more than a year.[8] (JA3320-JA3322; JA3326-3327; JA3338-JA3339; JA3418-JA3419; JA3441-3442; JA4615-4616). If successful, SGL would be compensated for delays, but not for losses incurred during dispute resolution, which is what Lane's termination option was purportedly intended to avoid. (*Id.*). If I4MP prevailed, in addition to not being compensated, SGL could be liable under

---

[7] Pursuant to the I4MP LLC Agreement, § 7.2 (JSA808). Notably, Lane did not negotiate a similar recusal provision in the JVA. (JA1091-JA1128).

[8] H&K stated in its August 24, 2018 memo, regarding a wrongful termination demand, that "[i]f I4MP does not believe SGL has an entitlement to demand I4MP terminate the CA … the only party incurring damages in this scenario is potentially SGL." (JA1154).

15

the DBA, §§19.1-19.2, for asserting a false or frivolous claim. (JA1171; JA1312-JA1330).

### iii.    *The CA and the chances of FDOT accepting the request for termination*

If I4MP passed SGL's termination request to FDOT, FDOT could, under the CA, §20.2.3, accept the notice or continue the CA for at least 180 days. (JA2050 and JA2204). Accordingly, H&K warned SGL in its December 7, 2017 (JSA625-JSA626) and May 24, 2018 memoranda (JA1134-JA1150) that the ultimate decision about termination rested with FDOT and concluded, in the May memo, that FDOT's acceptance of termination was "highly unlikely." (JA1142). Likewise, Meller and Subin testified that FDOT accepting termination was unlikely because it would mean shutting down an enormous infrastructure project.[9] (JA3674; JA3957-JA3958).

Even if FDOT accepted termination, it had sole discretion, under the CA, §20.5.3.1, and the DBA, §20.2, to require I4MP to assign the DBA to FDOT, and SGL had to accept and complete the Project. (JA1142; JA1335; JA2209).

Ultimately, H&K informed SGL that it was "extremely unlikely" SGL could "relieve itself of further obligations under the DBA as a result of an attempted forced termination of the CA due to Extended Relief Events." (JSA532-JSA545). As Meller testified, Lane never gave a satisfactory response as to why it felt termination would

---

[9] Dakus Gunn, Skanska_SE's delay expert, also testified that FDOT accepting termination was unlikely. (JA4268).

16

be successful, including how Lane intended to avoid all the contract provisions discussed above. (JA3941-JA3943; JA3957-JA3958).

## D.  The Potentially Catastrophic Consequences to SGL of a Conditional Notice of Termination

The possible repercussions of a wrongful termination threat were considerable. Indeed, as the District Court stated:

> [t]hreatening termination would mean the JV would lose any opportunity for reasonable negotiation with FDOT about the drilled shaft claim or anything else. There would be no wiggle room on the completion date, putting the JV at almost certain risk of defaulting and then incurring potentially unlimited liquidated damages and high reprocurement costs. And the partners would have to keep working during the disputes even after they tried to terminate, while being flyspecked by FDOT and having to 'dot every I and cross every T.' There would be litigation for years with both I4MP and FDOT, and not just this Project would be at risk; other current and future construction projects would be threatened, the companies would have to disclose whether they had been defaulted on all upcoming projects as a permanent black mark on their records, and they would be 'persona non grata' with FDOT, a massive customer. So the risks were just too high.

(JA4626-4627).

Testimony the District Court heard in reaching such a conclusion included DiPaolo's and Alger's respective testimony that termination was a "nuclear option" (JA3199; JA3208) and remedy of "last resort" (JA2816), and Meller's comparison of termination to a "nuclear war" and "World War III," which would cause SGL's life "to be hell." (JA3957-JA3958). Additional testimony, which the District Court appears to have fully accepted, included:

17

- Lunsford – SGL "would have to bet the company, essentially" that it was right about the 180 days.

  > Because if [they] were wrong about the 180-days-plus of entitlement, not only would the FDOT negotiations cease and [they] would lose any opportunity to have a reasonable discussion with FDOT about those discussions to settle claims, but [they] would be at risk of a potential default, [they'd] have no extension of time, and then [they'd] be looking at what could be unlimited damages as FDOT tries to reprocure the job and then says, in fact, [they] never even had 180 days of relief. Again, that would be litigated for years. And [they] would have had an obligation to perform throughout all of it.

(JA3321-3322).

- Fusco - Possible repercussions included reputational damage, shortlisting for bids on other projects, and I4MP and/or FDOT stopping productive negotiations. (JA3497-JA3499).

- Copenhaver - Termination is a "remedy of last resort;" avoidance of termination would lead FDOT to self-preservation, denials under the relief event provisions of the CA, and protracted litigation; and it was "really risky" to base termination on a "forecast of delay that hadn't actually extended the substantial completion date" as there was still time for delays to be mitigated. (JA3981-3986).

- Subin - If SGL was deemed to have breached or abandoned the project, liability was "unlimited." (JA3730-3731).

- Cavallaro - FDOT was Skanska_SE's biggest customer in Florida and invoking termination would have made it "persona non grata." (JA4028-4029).

18

- Gunn – Pursuing termination can be catastrophic, resulting in liquidated damages, delay costs, lost revenues, loss of financing, and reputational damages; it's the "riskiest" decision a contractor can make, a "last resort" and a "nuclear option." (JA4261-JA4263).

In addition, although the DBA caps SGL's damages at 35% of the DBA value (approximately $805 million), the cap does not apply to losses incurred because of SGL's intentional breach of the DBA, including abandonment. *See* §§19.2.12.1 and 19.2.12.3(e)-(f) (JA1327-JA1328).

Finally, threatening termination would have lost SGL SA22's significant benefits discussed below.

### E.　SA22 and Its Benefits

Following January and March 2020 meetings of SGL's Executive Committee, Skanska_SE and Granite independently voted in favor of SA22 and against termination, and Lane, after being forced to change tack by Webuild, voted to the contrary. (JA3192; JA4632-4633; JSA1241-JSA1246; JSA921-JSA1022; JSA1123-JSA1124). Skanska_SE, pursuant to its authority under the JVA, §4.3(b), then directed the partners to execute SA22. (JA2956-2957; JA3557-JA3558; JA4632-4633; JSA921-JSA1022).

Despite authorization under the DBA, §20.3, to seek injunctive or other equitable relief "to remedy or prevent any breach or threatened breach of this

19

Agreement…..," (JA1109), Lane never did. Rather, as the District Court noted, "[t]hroughout the negotiations, Lane repeated that termination was an option if settlement talks with FDOT broke down. But such a breakdown never occurred, and Lane did not press the point with its partners at that time." (JA4630; JSA1145-JSA1146). In fact, contemporaneous emails show Lane putting termination aside while the negotiations were gaining traction. (JSA894-JSA896). It was not until months after SA22 was executed, and Lane had accepted its benefits, that Lane sued Skanska_SE. (JA60-JA119).

On April 10, 2020, SA22 was consummated, resulting in, according to the District Court, "very favorable terms for [SGL]," including

> a $125 million payment from FDOT to SGL. The deal also massively curtailed SGL's exposure to likely liquidated damages by reducing… delay-related damages for the express lanes from about $178,000 per day to about $4,000 per day; this was a very good deal because the JV was facing potentially $90 million in delay-related liquidated damages…. But the deal also had significant nonmonetary concessions. FDOT agreed to require completion of only the general use lanes by the original substantial completion date of December 2020, which was more than doable…; it granted about a year extension of the completion date for completing the express lanes, another significant concession …. Additionally, … it permitted SGL to file a 'cumulative impact claim,' seeking recovery of an additional $368 million for other issues.

(JA4632-4633).

## F.　There Is No Evidence of Self-Dealing by Skanska_SE

The District Court determined that "Skanska SE reasonably relied on competent advice from counsel" in refusing to pursue or threaten termination

20

(JA4624-4625) and that "rejecting termination was in SGL's best interest." (JA4626). For instance, the District Court found that Lunsford, Skanska's in-house counsel,

> testified credibly about how seriously the company took the possibility of the termination option, with multiple attorneys looking into its viability. He persuasively explained that with the company losing so much money on the Project and people losing their jobs over it, if termination was a valid option, they would have taken it; but it was not.

(JA4624-4625). Specifically, Lunsford testified that Skanska_ID was a separate company from Skanska USA Civil[10] with a different culture and reporting obligations; he worked for and his salary and bonus came from Skanska USA Civil; due to Project losses, his office was closed and his bosses and colleagues were let go; and his job was to solely represent the best interests of SGL. (JA3360-JA3362).[11]

In addition, Fusco testified that Skanska USA Civil and Skanska_ID had separate profits and losses, and his evaluation and bonus were based entirely on Skanska USA Civil's performance. (JA3474). Likewise, DiPaolo testified that his bonus suffered from Skanska_SE's losses and he did not consider Skanska_ID's interests because he worked for Skanska_SE and Skanska USA Civil and his

---

[10] Skanska USA Civil, Inc. is Skanska_SE's parent company. (JA4609).

[11] Lane argues, relying upon Lunsford's testimony, that Skanska_ID and Skanska_SE had a potentially adverse position regarding sending a termination notice. (Brief, p. 12). This is irrelevant as to whether Skanska_SE and SGL had an adverse relationship.

professional obligation was to them. (JA3078-JA3079; JA3118-JA3119).

### i.      Lane's allegations against Subin and DiPaolo

Lane argued, in an attempt to malign Subin and DiPaolo in public case filings and the press, that Subin gave legal opinions benefiting Skanska_SE because he was pressured by DiPaolo to do so or was trying to curry favor with Skanska SE. However, the District Court found that Subin was a "well-known and respected construction lawyer with decades of experience," and there was no evidence that "Subin or anyone at H&K changed course, were improperly influenced, or acted inappropriately." (JA4624; JA4618). Specifically, the District Court rejected Lane's reliance upon an email which allegedly was a veiled message from DiPaolo to Subin to change his opinion on termination (JSA1132), finding the specific comment to which Lane referred made "eminent sense" and that both Subin and DiPaolo testified "credibly" that the email was DiPaolo's way of trying to understand SGL's options. (JA4618). After years of dragging Subin through the proverbial mud, Lane was ultimately forced to concede in its closing that Subin was "credible" and had acted "competently." (*Id.*).

### ii.      Lane's allegations against Kennedy

The District Court also properly rejected Lane's reliance upon Skanska AB's Vice President Richard Kennedy's involvement in the termination analysis as evidence of self-dealing and did not find that any of the emails offered by Lane

"illlustrat[ed] improper influence" by Kennedy over SGL, as Lane contends. (Brief, p. 14).

In addition, the District Court found that the timing of a 2019 email from Skanska AB's CFO, Magnus Persson, to Kennedy allegedly "direct[ing]" him to "work around this issue with also I4MPs [sic] undertaking in mind," "undercut" Lane's argument that it "influenced Skanska_SE's rejection of the termination option in late 2018" and that Kennedy "did not report to Persson and [] it was Persson's job to look out for I4MP, not Kennedy's." (JA3879-JA3881; JA3894; JA3910-JA3911; JA3924-JA3925; JA3930; JA4620-4621).

Lane's theory, as expressed by Alger and Botella, was that Kennedy "was against termination because it would cause Skanska ID to lose money (as part of the concessionaire I4MP[12])," but the District Court found "[n]one of the documentary or other testimonial evidence suggested any improper motive by Kennedy" and Alger's and Botella's beliefs were based only on "baseless" and "not credible" speculation about "Kennedy's motives[,]…body language and facial expressions" at SGL's October 19, 2018 meeting where "Lane's presentation of the termination option did not go well." (JA4618-4620).

---

[12] Of which John Laing Investments Limited and Skanska_ID were 50/50 partners. (JA3839-JA3840; JA4073-JA4074).

Conversely, the District Court accepted Kennedy's testimony, including that: "he doubted the viability of the termination option based on the advice of counsel and his experience in the construction industry;" (JA3850-JA3853; JA3867-3868; JA3912-JA3914; JA3922-JA3923; JA4618-4620); the Skanska entities' interests were "different," but not in conflict or out of alignment and Skanska's dual stake was a strength (JA3853-JA3855; JA3899-JA3903); and he sought assurance from Fusco that the entire $125M being negotiated with FDOT as part of SA22 would go to SGL. (JA3891; JSA1141).

In any event, the District Court ruled that "what Kennedy thought about the termination option was not dispositive because he was not the decisionmaker." (JA4620). Rather, Fusco was the decisionmaker and he testified to not feeling pressure from Kennedy nor needing his approval, but being skeptical of termination based upon counsel's advice. (JA3468-JA3470; JA3491–JA3499; JA3557-JA3559; JA4620-4621). Indeed, "Skanska SE executives and attorneys were all persuaded that pursuing the termination option was reckless because SGL could not prove a clear entitlement to the requisite 180 days of delay." (JA4620-4621).

This was a rebuke of Lane's argument that Skanska_SE's concern about the 180 days of delay was contrived. Despite having argued that for years, including at trial, Lane now acknowledges that "[i]t could be difficult to prove a 180-day qualifying delay while the DSC remained pending, and pursuing [termination] might

24

cause 'protracted litigation' or prompt FDOT to treat the drilled shaft claim unfavorably." (Brief, p. 10).

### iii. *Skanska AB was not financially incentivized to refuse termination*

Lane's argument, as expressed by its expert, Dennis, is that Skanska AB was incentivized to avoid termination because Skanska_ID's potential gains if the project was completed would be greater than Skanska_SE's actual losses. However, Dennis's conclusion does not comport with accepted industry practices, as he compares amounts of money received at different times, without accounting for the "time value of money," which, means a dollar today is worth more than a dollar one year from now. (JA2995-JA2996; JA3035-JA3036; JA4333-4339). As Dennis acknowledged, and Ralph Koch, Skanska_SE's expert, confirmed, if Dennis applied the present value calculation to Skanska_ID's anticipated profits, the projected cash flow to Skanska AB could have been negative. (JA3036; JA4339-JA4346).

### iv. *Granite had the same opinion about termination as Skanska_SE*

"[W]eigh[ing] heavily" in the District Court's decision was that "Granite shared the same concerns as Skanska_SE - SGL would have too much difficulty in providing 180 days of delay to pursue termination" and it "justifiably worried that if SGL sought to terminate, it would have to perform anyway and suffer serious harm to its reputation and exposure to costly liquidated damages." (JA4626).

Lane's counter to this is that the District Court failed to take into consideration

25

the conflict's effect on Granite. However, the District Court specifically stated that Granite's rejection of termination "puts the lie to Lane's assertion that Skanska_SE's influence blocked the JV's 'unbiased consideration' of that option." (JA4636). In any event, Lane cannot identify information that Granite lacked in making this decision and Granite has made no such complaint.

## G.    Lane Did Not Establish Causation or Damages

Lane appears to have abandoned any pretense of being able to estimate damages. Lane offered Dennis' testimony on this issue at trial but made no mention of it in its Brief. Likely, this omission is because the District Court found Dennis was not "credible" and his opinions were based on assumptions unsupported by the evidence. Rather,

> [o]n questioning by the Court, undercutting the core of his own opinions, Dennis admitted that he had no experience with P3s, termination was an action of last resort, he did not consider VLP's memo or truly consider the downsides to termination pointed out in H&K's memos, and he did not analyze the potential damages for wrongful termination or unlimited liability if SGL defaulted. Nor did the timing of Dennis's calculations (based on termination at the end of 2018) make any sense because at that point, Lane had not yet demanded termination. Rather, all three partners agreed to take part in settlement discussions with FDOT, which were bearing fruit.

(JA4628-4629). Indeed, even during trial, the District Court was skeptical of Dennis' opinion finding it was based on "a number of inferences piled on top of inferences." (JA3008-3009). As Koch testified, all of Dennis's assumptions represented SGL's

best case, such that "every single decision (over which SGL had no control) would have had to be done… in the favor of SGL." (JA4329-JA4332).

Conversely, in determining Lane had not been damaged, Koch considered the pleadings, legal memoranda that identified obstacles to termination, contract documents, and other causes of Project losses. (JA4331-JA4332).

**H.    Lane Repudiated Its Obligation to Pay Capital Calls in January 2021 and Thereafter  Skanska_SE and Granite Exclusively Financed SGL's Losses**

After failing to pay the January 2021 Capital Call and stating it would not make any further contributions, Lane was placed in default and removed from the Executive Committee in accordance with the JVA, and Skanska_SE and Granite financed SGL's losses. Lane underpaid its proportionate share by nearly $80 million at the time of trial in October 2023. (JA2272-JA2275). Respecting Lane and Webuild's appeal of the District Court's summary judgment order in Skanska_SE's favor regarding Lane's liability for its material breach of the JVA, under Federal Appellate Rule 28(i) and 11th Cir. R. 28-1(f), Skanska_SE adopts co-appellee, Granite's, Statement of Facts identified in pp.4-17of Granite's Brief.

## STATEMENT OF THE STANDARD OF REVIEW

As Lane acknowledges, findings of fact "are subject to review only for clear error." *Cooper v. Harris*, 581 U.S. 285, 293, 137 S. Ct. 1455, 1464–65, 197 L. Ed. 2d 837 (2017). *See also In re Wagner*, 2024 WL 4142990, at *4 (11th Cir. Sept. 11,

2024). This includes the finding as to whether a fiduciary duty has been breached. *See Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1051 (11th Cir. 1987).

Under the clearly erroneous standard, an appeals court "may not reverse just because [it] would have decided the matter differently." *Cooper*, 581 U.S. 285 at 293. Rather, a "finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Id. See also Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 940 (11th Cir. 2001). The appellate court "will not find clear error unless [its] review of the record leaves [it] with the definite and firm conviction that a mistake has been committed." *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018).

Furthermore, "[t]he decision whether to refuse or reduce prejudgment interest, that is, how to balance the equities, is within the trial court's sound discretion." *Id.* at 1298. Accordingly, this Court must "review the decision to grant prejudgment interest only for an abuse of that discretion." *Id.*

Respecting Lane's and Webuild's appeal of the summary judgment order in Skanska_SE's favor and the prejudgment interest awarded to Skanska_SE in the final judgment, under Federal Appellate Rule 28(i) and 11th Cir. R. 28-1(f), Skanska_SE adopts co-appellee, Granite's, Statement of the Standard of Review identified in pp.25-27 of Granite's Brief.

## SUMMARY OF THE ARGUMENT

Lane's legal argument in support of its contention that Skanska_SE should pay Lane hundreds of millions of dollars and excuse Lane from paying capital contributions, despite the District Court's finding that Skanska_SE did absolutely nothing wrong, is unsupportable. Since trial, Lane has abandoned all claims based upon anything other than FRUPA §620.8404(2)(b) and changed the theory underlying its FRUPA claim. While Lane argued in its pleadings, pre-trial filings and at trial that Skanska_SE "breached its fiduciary duties by acting against the best interests of the partnership" (JA4606), Lane now argues, implausibly, that Skanska_SE's actions are irrelevant and the District Court erred by never analyzing whether Skanska_SE is strictly liable under FRUPA based solely upon Skanska_ID, with whom Skanska_SE shares an "ultimate parent" (JA4609), being a partner in I4MP (the alleged conflict-of-interest).

However, FRUPA does not contain a strict liability no-conflict rule. Lane's theory relies upon a strained interpretation of one provision of FRUPA, ignoring other provisions and applicable case law which state that a partner must pursue its own interests without regard to the partnership and partners to have breached FRUPA's duty of loyalty. Furthermore, FRUPA's duty of loyalty is only breached when the partner is on the "other side of the table" in a transaction *with the partnership* (e.g., a partner borrows money, or purchases goods, from the

29

partnership), and, Lane admits Skanska_SE was on the "other side of the table" from Skanska_ID, not SGL (the "partnership"), concerning the request for termination (Brief, p. 35).

Under Lane's freshly concocted theory of liability, if it decided not to pay capital at any time, for any reason, it could get out of doing so by relying solely upon Skanska_SE's relationship with I4MP, despite Lane being aware of same from "day one." Indeed, this is what Lane tried to do. Following Lane's theory leads to an illogical conclusion: Skanska_SE, the managing member of SGL, would have to recuse itself from voting on any issues that could possibly impact the concessionaire, leaving only Lane and Granite, the two minority members, to vote, with no contractual mechanism for breaking a tie, leading to paralysis in case of disagreements, causing further delays and hampering, if not preventing SGL's performance. The ruling sought by Lane would also jeopardize the entire P3 project delivery model because design-build joint venturers are commonly related to concessionaires on P3 projects, as acknowledged by Botella and Alger.

Lane's argument that Skanska_SE should have provided additional information about Skanska_ID's financial incentives when termination was considered is also unavailing under FRUPA because the information Lane seeks does not concern "the partnership's business and affairs." Further, it is undisputed that Skanska_SE did not have the information or access to it (JA3632-3633); and the

30

information is immaterial because neither Lane nor Granite has claimed that their positions on termination would have changed with the benefit of such information.

Lane's FRUPA claim fails for several additional reasons. For instance, FRUPA excludes specific transactions from the purview of the statute if they have been authorized. Here the District Court held, and Lane ignored, that Lane's "cries of conflict," arising from Skanska_SE and Skanska_ID sharing "ultimate parent" Skanska AB, "ring hollow[]," relying upon Lane's knowledge of the relationship between Skanska_SE and Skanska_ID before the venture, and its previous work with Skanska on P3s. (JA4636).

Furthermore, Lane did not prove that withholding the Equivalent Claim Notice caused Lane damage. In this regard, Lane continuously discounts its obligation to establish causation, arguing only that it does not have to prove the exact amount of damages. While difficulty proving the amount of damages will not preclude recovery, if there is a reasonable basis for same, which there is not here, the District Court agreed that "the plaintiff must still prove it was damaged in the first place," and Lane did not. (JA4637).

Concerning Lane's request to shift legal fees, the District Court's decision to award fees was not clearly erroneous and there are no equitable considerations under which Skanska_SE, after being dragged through a litigation devoid of merit, and winning resoundingly at trial, should be precluded from receiving compensation for

the significant legal fees it was required to incur and to which it is contractually entitled. Nor are there grounds for Lane to be awarded fees or equitable relief.

As to Lane and Webuild's appeal of the District Court's summary judgment order in Skanska_SE's favor and the prejudgment interest awarded to Skanska_SE in the final judgment, under Federal Appellate Rule 28(i) and 11th Cir. R. 28-1(f), Skanska_SE adopts co-appellee, Granite's, Summary of Argument identified in pp.27-29 of Granite's Brief.

## ARGUMENT AND CITATIONS OF AUTHORITY

### POINT I

### THE DISTRICT COURT CORRECTLY RULED THAT LANE DID NOT PROVE THE ELEMENTS OF ITS BREACH OF FIDUCIARY DUTY CLAIM

**A.   Skanska_SE Did Not Breach Its Duty Of Loyalty To Lane**

*i.      A breach cannot be found as there has been no harm to SGL or Lane*

Lane does not submit any valid authority for its preposterous new strict liability argument. Rather, a partner must "pursue [its] own interests without regard to the partnership and other partners" to have breached the duty of loyalty under FRUPA. *Welch v. Via Christi Health Partners, Inc.*, 281 Kan. 732, 758 133 P.3d 122 (2006). *See also In re Chira*, 353 B.R. 693, 726–27 (Bankr. S.D. Fla. 2006), *aff'd,* 378 B.R. 698 (S.D. Fla. 2007), *aff'd,* 567 F.3d 1307 (11th Cir. 2009) (finding defendant violated the FRUPA fiduciary duty of loyalty "by the entire course of her

32

conduct"). The *Welch* court concluded that, under a provision identical to §620.8404(2)(b), there was no breach "[a]s the plaintiffs did not establish that [the general partner] was acting as or on behalf of an adverse party or that its actions harmed the partnership." *Id.* at 764.

Lane's reliance upon the comment to the Harmonized Uniform Partnership Act ("HUPA"), §409(b)(2), that "[a]bsent informed consent" (which there was here), the duty of loyalty "is breached by the mere existence of the conflict of interest," is unavailing. Lane disregards the HUPA provision specifically stating that "[i]t is a defense to a claim under subsection (b)(2) and any comparable claim in equity or at common law that the transaction was fair to the partnership." §409(g). Indeed, the comment on which Lane relies specifically states "*[b]ut see* Subsection (g) (permitting the defense of fairness)," defeating Lane's argument that FRUPA "does not allow for a fairness defense." (Brief, p. 25-26; 31).

Furthermore, §620.8404(5) maintains that "[a] partner does not violate a duty or obligation under this act or under a partnership agreement merely because the partner's conduct furthers the partner's own interest."[13] Similarly, the Uniform

---

[13] Lane disregards this section despite the law stating that a statute must be interpreted within "the specific context in which that language is used" and "the broader context of the statute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997).

Comment to §620.8404 states that "a partner may legitimately pursue self-interest…

and not solely the interest of the partnership and the other partners, as must a true

trustee"; and "[a] partner as such is not a trustee and is not held to the same standards

as a trustee," particularly concerning the duty of loyalty. *See also Welch*, 281 Kan.

at 756.

In interpreting a provision identical to §620.8404(5), the court in *Enea v.

Superior Ct.*, 132 Cal. App. 4th 1559, 1566 (2005), held that its purpose was to

"excuse partners from accounting for incidental benefits obtained in the course of

partnership activities *without detriment to the partnership*." *See also In re Textainer

P'ship Sec. Litig.*, 2005 WL 3801596, at *12 (N.D. Cal. Dec. 12, 2005) ("[p]artners

may not take advantages for themselves at the expense of the partnership"). Indeed,

Lane acknowledges that there must be a benefit to the partner at the expense of the

partnership when it cites *Carolina Pres. Partners, Inc. v. Wolf Arbin Weinhold*, 414

B.R. 754, 763 (M.D. Fla. 2009), for the proposition that "the paradigmatic example

[of a conflict-of-interest] is where a partner, or its affiliate stands to benefit from a

decision that will harm the partnership." (Brief, p. 34-35).

Because the District Court found that Skanska_SE acted in SGL's and Lane's

best interest, it correctly ruled that Skanska_SE did not breach FRUPA's duty of

loyalty.[14]

### ii. *A breach of the duty of loyalty under FRUPA §620.8404(2)(b) cannot be predicated upon the relationship between Skanska_SE and Skanska_ID*

Lane acknowledges that for §620.8404(2)(b) to apply, a partner must be "on the other side of the table" in a "dealing" with the **partnership (SGL)** but then admits that Skanska_SE was "on the other side of the table" from **Skanska_ID** (in Skanska_ID's role as a member of I4MP), not SGL. (Brief, p. 34-35).[15] Indeed, Skanska_SE actually represented SGL (as opposed to facing it across a proverbial table) in its dealings with FDOT, the entity with whom it negotiated SA22.

Adversity between the partner and the partnership is expressly required by

---

[14] The District Court properly refused to shift Lane's burden to Skanska_SE. (JA4635). It agreed that, under the Florida Standard Jury Instructions, §451.2, plaintiff must establish defendant owed a fiduciary duty, a breach of which caused plaintiff harm. *See also In re DeMasi*, 542 B.R. 13, 32 (Bankr. M.D. Fla. 2015). Such claims must be proven by the "greater weight of the evidence," meaning "the more persuasive and convincing force and effect of the entire evidence in the case." §451.3. Only then are defenses considered. §§451.11-451.13. The one case Lane cites, *Williams v. Stanford*, 977 So. 2d 722 (Fla. Dist. Ct. App. 2008), deals with fairness in a merger between a parent and subsidiary, and is, therefore, inapplicable. Furthermore, the District Court found this issue was "moot because even if the burden did shift to Skanska_SE, the evidence overwhelmingly shows that Skanska_SE acted in the best interest of JV and Lane." (JA4635).

[15] Lane alleges Lunsford admitted that SGL's and I4MP's interests were adverse on the termination option (JA3427) but does not identify the exact language to which it is referring. Lunsford actually said there was "an arms-length deal with I4MP," but he did not consider that a conflict. (JA3428). In any event, this proves the transaction at issue herein was between Skanska_SE and I4MP, not between Skanska_SE and SGL.

§620.8404(2)(b) which states that a partner shall "refrain from dealing with the partnership in the conduct… of the partnership business as or on behalf of a party having an interest adverse to the partnership."[16] Furthermore, §620.8103(d)(2) states that there must be a "specific act or transaction" for the duty to be violated; and the comments to §409(b)(2) of HUPA, upon which Lane relies, state that "the phrase 'adverse interest' is a term of art, meaning 'to be on the other side of the table' in some dealing with the partnership.'"

The Restatement (Second) of Agency, §389, upon which Lane also relies, describes a transaction that might violate the duty of loyalty as one in which "an agent employed to sell [goods] at the market price…, without disclosure to the principal, … buy[s] the goods on his own account." *Carolina Pres. Partners,* 414 B.R. at 763 (M.D. Fla. 2009), upon which Lane relies, also provides an example of a partner being averse to the partnership where the partner attempted to mortgage partnership property to pay his individual debts.

The only other case Lane cites on this point, *Woods v. City Nat. Bank & Tr.*

---

[16] To the extent Lane, once again, attempts to change its theory to claim that Skanska_SE was "on the other side of the table" from SGL as a result of Skanska_SE's relationship with I4MP, its argument must be rejected as Skanska_SE did not deal with SGL "as or on behalf of" I4MP with respect to termination. Indeed, even Skanska_ID, the I4MP partner, had to recuse itself if SGL demanded termination, pursuant to the I4MP LLC Agreement, § 7.2 (JSA808).

*Co. of Chicago*, 312 U.S. 262, 268 (1941), does not involve FRUPA. It holds that a professional serving in a bankruptcy case can only be compensated if it provided loyal, disinterested service such that it did not have conflicting obligations to two "masters." That has no applicability to this matter and, indeed, underscores Lane's confusion about FRUPA. FRUPA does not prohibit any "conflict" but, rather, particular transactions between a partner and the partnership.

Conversely, *Welch*, *supra*, is comparable. In interpreting a provision identical to §620.8404(2)(b), it found a merger between MR Imaging, L.P. and MRI, LLC, which was controlled and managed by Via Christi, the general partner of MR Imaging, L.P., not to be a breach of Via Christi's duty of loyalty. Specifically, there was no "evidence of adversity" between Via Christi and the partnership. *Id.* at 763-764. The district court also relied upon the fact that Via Christi was contractually authorized to amend the partnership agreement and that a provision against such amendment could have been made part of the partnership agreement. *Id.* at 761-762.

Finally, any allegation based upon the formation of the JVA cannot be the basis for a breach of loyalty as the Uniform Comments to §620.8404 states that "[r]eference to the 'formation' of the partnership has been eliminated by RUPA because of concern that the duty of loyalty could be inappropriately extended to the pre-formation period when the parties are really negotiating at arm's length" and that a partner only becomes a fiduciary "[o]nce a partnership is agreed to." *See also*

37

Uniform Comments to HUPA § 409(b)(2) (fiduciary "duties apply beginning with 'the conduct of the partnership's activities and affairs,' which by definition cannot exist before the partnership does; thus, the stated duties do not apply to pre-formation activities"). In any event, Skanska_SE was averse to Lane and Granite, not SGL, in the formation of SGL. As such, the adversity required to legally sustain a claim for breach of FRUPA's duty of loyalty against Skanska_SE is absent.

### iii.    *Skanska_SE's fiduciary duty is found in the JVA, not FRUPA*

Parties are entitled to establish their own fiduciary obligations under Fla. Stat. §620.8103, which provides that "relations among partners and between partners and a partnership are governed by the partnership agreement" and, with some limited exceptions, FRUPA only applies "to the extent the partnership agreement does not otherwise provide." *See also Landstar Glob. Logistics, Inc. v. Haskins*, 2012 WL 39514, at *9 (M.D. Fla. Jan. 9, 2012) (plaintiff failed to prove defendant breached its "contractually-based fiduciary duty").

Since the partners' "fiduciary requirements" were prescribed in the JVA, §10.5(iv), which includes Skanska_SE's obligation to perform its functions as Managing Party of SGL in "good faith" (§4.3(b)) and not to engage in "gross negligence, willful misconduct or bad faith" (§5.4), FRUPA should not be applied. (JA1098).

38

### iv.    *Skanska_SE did not fail to disclose any information*

Lane argues that Skanska_SE should have provided additional information about Skanska_ID's financial incentives when termination was being considered, relying upon Fla. Stat. §620.8403(3)(b). However, Lane conflates the common law duty of disclosure emanating from the duty of loyalty and the separate duty under §620.8403(3)(b) to provide "information concerning the partnership's business and affairs."[17] The information Lane claims it requested concerned Skanska_ID, not SGL's "business and affairs." Therefore, it is not required under Fla. Stat. §620.8403(3)(b).

Further evidence of Lane's conflation of the two disclosure obligations is its reliance upon *Alloy v. Wills Fam. Tr.*, 179 Md. App. 255 (2008). *Alloy* concerns whether, under D.C. law, a general partner in a limited partnership[18] breached its common law duty of disclosure to inform the other partners that it was secretly acquiring properties that would directly compete with the partnership's ongoing

---

[17] This language was changed from the Uniform Partnership Act, which required the disclosure of "all things affecting the partnership." *Allan W. Vestal, The Disclosure Obligations of Partners Inter Se Under the Revised Uniform Partnership Act of 1994: Is the Contractarian Revolution Failing?*, 36 Wm. & Mary L. Rev. 1559, 1580-81 (1995).

[18] General partners in a limited partnership owe an even greater fiduciary duty than those in a general partnership. *Alloy*, 179 Md. App. at 281.

business, not a statutory disclosure requirement regarding a partnership's "business and affairs." *Id.* at 294. Even if Lane had argued that Skanska_SE violated its common law disclosure obligations, *Alloy* does not state that a partner must disclose "all facts relevant to the conflict," as Lane asserts. (Brief, p. 34). Rather, a specific type of information, which is not at issue here, was undisclosed in *Alloy*.

Furthermore, Fusco testified that Skanska SE did not have the financial information Lane was seeking, or access to it. (JA3632-3633).

Even assuming, *arguendo,* that I4MP had provided Skanska_SE the requested information and Skanska SE was obligated to provide it to Lane, Skanska_SE still did not breach a fiduciary duty because such information was immaterial to SGL's interests in entering into SA22, the transaction of which Lane complains. *See Wallace v. Odham*, 579 So. 2d 171, 175 (Fla. 5th DCA 1991) (a fiduciary breach is based upon a failure to disclose a material fact); *In re Palm Ave. Partners, LLC*, 576 B.R. 239, 251 (Bankr. M.D. Fla. 2017) (same). As evidenced by their positions in this litigation, both Lane and Granite continue to assert, with the benefit of all information, that their votes were appropriate. Accordingly, providing them with additional information would not have affected the outcome of the transaction.

### v. The District Court correctly found that, to the extent there was a breach of Skanska SE's fiduciary duty, it had been ratified

The District Court found, and Lane does not dispute, that the relationship between Skanska SE and I4MP was ratified. (JA4636; JA4610). Such ratification

40

precludes imposition of liability upon Skanska_SE, regardless of whether the relationship breached the duty of loyalty (which it did not).

Specifically, under Fla. Stat. §620.8103, partners "may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty." *See also Litman v. Prudential-Bache Properties, Inc.*, 1993 WL 5922, at *5 (Del. Ch. 1993) (partner's prior acknowledgment of "potential" conflict and self-dealing precludes a complaint that such conflict and self-dealing became a breach of fiduciary duty); *Rodriguez v. Jacoby & Meyers, LLP*, 6 N.Y.S.3d 240 (1st Dept. 2015) (same); Uniform Comments to §620.8404 (other partners may "consent to a specific act or transaction that otherwise violates one of the rules)"; Uniform Comments to HUPA, §409(b)(2) (duty is not breached where there has been "informed consent"); Restatement (Second) of Agency, §§ 389 and 391 (duty of an agent not to deal with his principal as an adverse party only applies "unless otherwise agreed" and only if the transaction is "without the principal's knowledge").

For instance, in *Nolan v. Virginia Inv. Fund Ltd. P'ship*, 833 So. 2d 853, 856 (Fla. 3d DCA 2002), plaintiff complained that defendant breached its fiduciary duty by allowing a trading advisory to "become heavily skewed towards investing in funds in which defendant [] was the General Partner." This argument was rejected because plaintiff knew defendant was going to retain trading advisors who invested

41

in commodity pools operated by, or in relationships with, defendant.

Similarly, the plaintiff in *Archer v. Med. Protective Co. of Fort Wayne, Indiana*, 2004 WL 1194455, *5 (N.D. Tex. 2004) claimed her attorneys failed to represent her interests because their actions were "adversely limited by" their "own interests in keeping the business and favor" of the insurer that hired them. In dismissing the claim, the court relied upon the fact that, like Lane, plaintiff was "at all times aware of that potential conflict of interest…." and able to seek independent counsel at any time. *Id.*

## B.   The District Court Correctly Ruled That Lane Did Not Establish The Fact, Or Amount, Of Damages

As the District Court stated, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." (JA4634-4635). *See also Gracey v. Eaker*, 837 So. 2d 348, 353 (2002). Lane conflates the *fact of damages* with the *amount of damages*, arguing that neither has to be proven with any certainty. While difficulty proving the *amount* does not preclude recovery, the District Court agreed that "there must still be a reasonable basis for the damages-and the plaintiff must still prove it was damaged in the first place" and if the "*fact of* damage" is "purely speculative, there can be no liability." (JA4637).

This rule is supported by the cases upon which Lane relies. For instance, *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1343-1344

42

(S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11ᵗʰ Cir. 2008), explained that to relax the reasonable certainty requirement concerning the *fact of damage* would impermissibly allow the exception to "swallow the rule" because "it is nearly always the case that the alleged wrongdoer's conduct alters the plaintiff's future course of dealing and therefore prevents lost profits from being readily ascertainable." *See also Twyman v. Roell*, 123 Fla. 2, 7-8 (1936) ("uncertainty which defeats recovery" respects the "cause of the damage rather than [] the amount of it").

The *AlphaMed* court ultimately determined plaintiff had to, but did not, prove to a reasonable certainty the "but for" assumptions necessary for causation, or that the "entire scenario could be accepted by a reasonable person as being reasonably certain." *Id.* at 1347. Rather, the evidence demonstrated that many assumptions "were demonstrably false, prohibited by law or, at the very least, speculative." *Id.*

Concerning the *fact of damage*, a plaintiff must prove that "it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result" of which it complains. *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 106 (11ᵗʰ Cir. 2014). Stated otherwise, plaintiff must "show that what was done or failed to be done probably would have affected the outcome." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced" a verdict must be

43

directed for defendant. *Whitney v. R.J. Reynolds Tobacco Co.*, 157 So. 3d 309, 312 (Fla. 1st DCA 2014); *Old Park Inv., Inc. v. The Vessel "LEDA"*, 469 F. Supp. 2d 1201, 1209 (S.D. Fla. 2006).

In *Kaplan v. Nautilus Ins. Co.*, 2019 WL 12265654, at \*12 (S.D. Fla. 2019), *aff'd*, 861 F. App'x 798 (11th Cir. 2021), plaintiffs did "not present sufficient evidence to support a claim for lost profits" where they did "not point to any record evidence that demonstrates that Defendant's conduct caused the alleged lost profits." Rather, Plaintiffs presented "their own self-serving testimony" which is "insufficient to establish lost profits." *Id.*

In concluding that Lane had not proven the *fact of damages*, the District Court found Lane's admission that "no one knows exactly what would have happened had the JV made a demand for termination" to be "damning." (JA4637). Lane theory has morphed throughout this litigation: up to the beginning of trial, Lane's position was that termination, rather than SA22, was the better option. At trial, Lane changed its theory, arguing that merely threatening termination would have created sufficient leverage to avoid SGL's losses. However, no proof was offered that such action would have elicited a better result for SGL than consummating SA22 and not resulted in the serious consequences that concerned the numerous lawyers, experts,

44

and construction professionals discussed herein.[19]

Only once a court determines "[p]laintiffs are able to sufficiently demonstrate the fact of damages" does the court reach "the question of whether Plaintiffs are able to [reasonably] calculate the amount of damages." *Id*. Courts have been willing "to accept a degree of uncertainty" regarding the amount of damages where it is difficult to ascertain damages due to the "vagaries of the marketplace" and a wrongdoer's actions preclude precise computation of damages. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).  However, there still must be "a reasonable basis" in the evidence "for the amount awarded." *Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F.3d 1277, 1280 (11th Cir. 2012). *See also Mortg. Now, Inc. v. Guaranteed Home Mortg. Co.*, 545 F. App'x 809, 812 (11th Cir. 2013); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1540 (11th Cir. 1985); *Bass Venture Corp. v. Devom, LLC*, 342 So. 3d 821, 824 (Fla. Dist. Ct. App. 2022).

Many of the cases cited by Lane in its appeal brief support Skanska_SE's argument that there must be a reasonable basis for a damages award.[20] For instance,

---

[19] Lane acknowledged in its brief that "outside counsel's memoranda did warn the [termination] strategy presented risks," but went on to say that Lane "viewed an equivalent claim notice as its only leverage." (Brief, p. 10). Lane appears to mistakenly believe that its opinion was the only one that mattered.

[20] *Saeme v. Levine*, 2012 WL 13134605 (S.D. Fla. Sept. 13, 2012) and *Quinn v. Phipps*, 113 So. 419, 422 (1927) are inapplicable as Lane relies upon them for their discussion of the imposition of equitable relief, not monetary damages. It is unclear what proposition Lane is relying upon *Woods v. City Nat. Bank & Tr. Co. of*

*Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, 2014 WL 3417569, at \*7 (M.D. Fla. July 14, 2014), held the evidence must show "the extent of the damages as a matter of just and reasonable inference" and while proof "may be based on estimates and assumptions," such assumptions must "rest on adequate data" and plaintiff must provide "some evidence by reference to which the amount of damages may be satisfactorily ascertained." In *Gratz v. Claughton*, 187 F.2d 46, 51–52 (2d Cir. 1951), the court held that "when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount."

In addition to not establishing the fact of damages, Lane never presented any evidence of a reasonable basis for the amount of damages it claims, as required under controlling law.

## POINT II

### THIS COURT SHOULD NOT REACH THE MERITS OF LANE'S ARGUMENT BECAUSE IT WAS NOT RAISED BELOW

If Lane truly believed its recently manufactured argument that Skanska_SE

---

*Chicago*, 312 U.S. 262, 268, (1941) for in Part IIA of its Brief, but it does not support Lane's argument that a plaintiff need prove neither causation nor damages. Indeed, *Woods* is distinguishable as discussed above.

46

breached its duty of loyalty under FRUPA simply because it shared the same "ultimate parent" with Skanska_ID, regardless of Skanska_SE's actions, Lane should have raised it in its Complaint, at any point before trial, over the 10 days of trial and/or in the hundreds of pages of pre and post-trial briefs it submitted to the District Court, but it did not. Indeed, the District Court summarized Lane's argument at trial by stating that Lane claimed, "Skanska SE breached its fiduciary duties by acting in the best interest of Skanska_ID rather than Lane (or the JV) in not pursuing the termination option." (JA4634).

As this Court stated in *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1326 (11th Cir. 2004), the Court of Appeals cannot "reach the merits" of a claim which is "wholly different from the one [ ] brought to the district court." The *Access Now, Inc.* court recognized, but rejected, the following "exceptional conditions" under which issues can be raised for the first time on appeal:

> First, an appellate court will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice. Second, the rule may be relaxed where the appellant raises an objection to an order which he had no opportunity to raise at the district court level. Third, the rule does not bar consideration by the appellate court in the first instance where the interest of substantial justice is at stake. Fourth, a federal appellate court is justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt. Finally, it may be appropriate to consider an issue first raised on appeal if that issue presents significant questions of general impact or of great public concern.

*Id.* at 1332.

47

Each exception is inapplicable in this case as follows. First, Lane's new argument is premised, in part, upon the factual contention that Skanska_SE had a conflict. Additionally, in finding no miscarriage of justice the *Access Now, Inc.* court stated that "[u]nlike in *Edwards,* where the opposing party virtually admitted that it had done wrong, we have before us a highly contentious and important question." *Id.* at 1334. Likewise, there is no admission of wrongdoing by Skanska_SE.

Second, Lane could have raised this argument at any time during the years the case was pending. *See Id.* (it is "very different to raise an issue on appeal based on statements that counsel may have failed to object to in the split-second pressure of argument in a jury trial, as opposed to fact-bound issues that the party had an opportunity to present to the district court").

Third, the *Access Now, Inc.* court noted that it had "never once elected to evaluate a new argument" because substantial justice was at stake. *Id.* at 1333. Rather, they had to go back nearly three decades to find a case before the Fifth Circuit, involving an "unusual circumstance" of a lawyer making patently false representations as well as "highly prejudicial and inflammatory remarks" in his closing. *Id.* at 1332-1333. The court noted how the Fifth Circuit "took pains to emphasize, [ ] [its] continued reluctance to address for the first time on review errors which the trial court was not given an opportunity to consider and correct." *Id.* at 1333-1334.

Fourth, the *Access Now, Inc.* court found that the argument therein depended upon an evaluation of facts, records, and testimony, so it was a "difficult question, and one about which there is considerable doubt." *Id.* at 1334. Furthermore, even the "purely legal question" at issue was "far from beyond any doubt" as there was a circuit split. *Id.* at 1334. The District Court's forty-page opinion in this matter was a thorough, well-reasoned evaluation of facts and legal issues. Lane has not shown that the District Court was wrong in any way, let alone "beyond any doubt."

Fifth, this is a very fact-specific case, and, therefore, there is no significant question of general impact or great public concern.

<b><u>POINT III</u></b>

<b><u>LANE IS NOT ENTITLED TO EQUITABLE RELIEF</u></b>

**A.     Lane Is Not Entitled to Disgorgement**

Lane's disgorgement claim fails because equitable remedies, like monetary damages, require proof of causation. *Ameritox, Ltd. V. Millennium Lab'ys, Inc.*, 2014 WL 1456347, at \*10 (M.D. Fla. Apr. 14, 2014) (a party has to prove causation to succeed on a claim for disgorgement); *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 209 (Fla. Dist. Ct. App. 2019) (granting summary judgment for damages and declaratory and injunctive relief where there was no evidence of causation).

Lane's disgorgement claim also fails because, as discussed in *S.E.C. v. Monterosso*, 557 F. App'x 917, 928 (11th Cir. 2014), a case relied upon by Lane, to

49

recover damages for disgorgement, a plaintiff needs to produce "a reasonable approximation of the defendant's ill-gotten gains," which Lane has failed to do.

## B.      There Are No Grounds for Shifting Attorneys' Fees

"Florida courts follow the 'American Rule' that attorney's fees may only be awarded pursuant to an entitling statute or agreement among the parties." *Nagel v. Glob. Growth Holdings, Inc.*, 2024 WL 1701142, at *2 (M.D. Fla. 2024). Lane's argument for an exception relying upon *Larmoyeux v. Montgomery*, 963 So. 2d 813 (Fla. Dist. Ct. App. 2007), is unavailing.

The exception discussed in *Larmoyeux* and the two out-of-state cases it cites, upon which Lane also relies, only applies to actions involving a suit for dissolution and/or accounting between partners. *Id.* at 818. *Larmoyeux* stands for the proposition that FRUPA did not overrule the common law which allowed attorney's fees in such cases, not that FRUPA provides a basis for attorney's fees. *Id.* at 820. As neither FRUPA nor the common law allows for attorney's fees for a breach of fiduciary duty, there is no basis for awarding them here.

Furthermore, while there is an exception for bad faith conduct, it "is rarely applicable" as it "is reserved for those extreme cases where a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons." *Bitterman v. Bitterman*, 714 So. 2d 356, 365 (Fla. 1998). The court's imposition of sanctions under this doctrine "must be based upon an express finding of bad faith conduct and must be supported

50

by detailed factual findings describing the specific acts of bad faith conduct that resulted in the unnecessary incurrence of attorneys' fees" after notice and the opportunity to be heard. *FCCI Com. Ins. Co. v. Empire Indem. Ins. Co.*, 250 So. 3d 858, 862 (Fla. Dist. Ct. App. 2018). Since the District Court ruled, in a 40-page comprehensive opinion, that the only wrongdoer in this matter was Lane, Lane is not entitled to attorney's fees.

**C.　To The Extent Lane and Webuild Have Not Forfeited Their Challenge to the District Court's Award of Prejudgment Interest, There are No Grounds for Denying Skanska SE Prejudgment Interest**

As to Lane and Webuild's appeal of the District Court's award of prejudgment interest to Skanska SE, under Federal Appellate Rule 28(i) and 11th Cir. R. 28-1(f), Skanska SE adopts co-appellee, Granite's, Argument Section identified in pp.29-51 of Granite's Brief. However, even if Lane preserved the issue for appeal as argued by Granite in its Brief, Lane's argument must be rejected. In addition to the reasons raised by Granite, the District Court found as to Skanska SE that there was no dispute that "it paid $570,000.00 on top of its proportionate share of the September 2021 capital call, so that payment was a demand loan to Lane, entitling Skanska SE to higher interest on that amount." (JA4640). Thus, as to the $570,000.00 demand loan, the District Court found that Skanska SE was entitled to the higher prejudgment interest under Article 8.2 of the JVA with the balance of the judgment accruing interest at Florida's statutory rate "from the time of Lane's improper refusal to

51

contribute working capital." (JSA1234). The District Court also found that Skanska_SE was entitled to prejudgment interest as to the balance of Skanska_SE's overpayment of working capital calls. (JSA1235; JA4638-JA4641).[21]

In addition, the cases relied upon by Lane specified the following factors to be considered in determining whether to deny an award of prejudgment interest: "(1) whether the losing party is a government entity, (2) whether the delay between injury and judgment is the fault of the prevailing party, and (3) whether it would be equitable to award prejudgment interest to a party who could have but failed to mitigate damages." *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1289 (M.D. Fla. 2015). *See also Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1297–98 (11th Cir. 2002).[22] Lane does not raise any of those considerations but relies solely upon its contention that it had a defense to the working capital requests. Raising a defense that a party believes has merit, whether it turns out to or not, is typical of nearly all cases and is certainly not an "equitable

---

[21] JSA1234 and JSA1235, which reflect Skanska_SE's calculation of prejudgment interest as to the demand loan and balance of working capital calls were not objected to by Lane during trial.

[22] The third case Lane cites, *Arizona Chem. Co., LLC v. Mohawk Indus.*, Inc., 197 So. 3d 99, 105 (Fla. Dist. Ct. App. 2016), states only that "unique facts and 'considerations of fairness' might militate against calculating prejudgment interest from the date of actual loss." There are no unique facts herein and fairness requires that Skanska_SE be awarded prejudgment interest.

52

consideration." Lane has not offered a single argument for how or why the District Court abused its discretion in granting Skanska_SE prejudgment interest. As argued by Granite, under Florida law, "a plaintiff is entitled to prejudgment interest as a matter of law." *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir. 2007) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985)). So, as the prevailing party, Skanska SE was entitled to prejudgment interest as a matter of law. *Gemini Ins. Co. v. Zurich Am. Ins. Co.*, 119 F.4th 1296, 1303 (11th Cir. 2024) (quoting *Argonaut*, 474 So. 2d at 215).

Finally, Skanska SE also requests to the extent the final judgment is modified that Skanska SE be entitled to both contractual (as to the demand loan) and statutory prejudgment interest (as to the balance of Skanska SE's award) up through the entry of the modified final judgment on remand. *See, e.g., Gemini Ins.*, 119 F.4th at 1304 (directing entry of amended judgment with prejudgment interest "to the date of the amended final judgment"); *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 233 F. App'x 890, 895 (11th Cir. 2007) (agreeing that prejudgment interest continued to accrue up through the date the judgment was entered on remand); SEB, 476 F.3d at 1321 ("Because postjudgment interest . . . began to accrue on the date of the amended judgment, the District Court should have awarded prejudgment interest until that date.").

53

**D.**     **There are No Grounds For Awarding Nominal Damages**

Nominal damages are permissive, not mandatory. *In Re: Samuel Edward Cooley, Debtor, Datex Inc., Appellant, v. Samuel Edward Cooley, Appellee.*, 2024 WL 4605229, at *3 (M.D. Fla. Oct. 29, 2024). Furthermore, some damage has to have been caused by the alleged breach of fiduciary duty and nominal damages may be waived if not raised at any stage of the proceedings. *Land & Sea Petroleum Holdings, Inc. v. Leavitt*, 321 So. 3d 810, 817–18 (Fla. Dist. Ct. App. 2021). Nominal damages are impermissible as Lane has not proven any damage or claimed to have requested nominal damages.

**E.**     **There are No Grounds for a Declaratory Judgment**

Lane appears to have narrowed its request to a "declaration that Skanska breached its fiduciary duties to SGL and Lane." (Brief, p. 47). However, questions regarding whether torts have been committed or contracts adequately performed are inappropriate for declaratory judgment. *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1231 (S.D. Fla. 2009); *Nview Health, Inc. v. David V.*, 2022 WL 16923585, at *15 (M.D. Fla. Nov. 14, 2022). Rather, declaratory judgments are designed to "clarify the legal relations at issue and to settle controversies prior to a legal breach of duty or contract." *Id.*

## F.    Injunctive Relief is Inappropriate

The issue of whether injunctive relief is appropriate was never raised before the District Court and, therefore, it must be dismissed for lack of jurisdiction. *Barber v. Wonderland Greyhound Park*, 656 So. 2d 961, 962 (Fla. Dist. Ct. App. 1995).

Furthermore, Lane fails to discuss any of the elements required for temporary injunctive relief. *See Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 196 (Tex. App. 2012) (requiring a cause of action, irreparable injury, and a probable right to relief); *Ne. Nat. Energy LLC v. Pachira Energy LLC*, 243 W. Va. 362, 366, 844 S.E.2d 133 (2020) (requiring the court to find "a clear showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law; and the necessity of a balancing of hardship test including: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest"). As discussed herein, none of these elements have been met as the District Court found that Skanska SE's actions did not harm SGL or Lane.

## POINT IV

## THE DISTRICT COURT'S DECISION GRANTING SUMMARY JUDGMENT WAS ENTIRELY PROPER

As to Lane's appeal of the District Court's award of summary judgment, Skanska SE adopts co-appellee, Granite's, Argument Section identified in pp.29-51 of Granite's Brief.

## CONCLUSION

For the reasons stated above, Skanska_SE requests that Lane's appeal be denied in its entirety.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,959 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in Microsoft Word using a proportionally spaced typeface (Times New Roman, 14 point).

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that the foregoing document is being served on all participants in the case, who are all registered CM/ECF users and that service will be accomplished via transmission of Notices of Electronic Filing generated by CM/ECF.

By:    */s/ Gary M. Stein*
      PECKAR & ABRAMSON, P.C.
      One Southeast Third Avenue, Suite 2000
      Miami, FL 33131
      Ph: 305-358-2600
      Fax: 305-375-0328
      GARY M. STEIN
      Florida Bar No. 378933
      gstein@pecklaw.com
      JERRY P. BRODSKY
      Florida Bar. No. 948561
      jbrodsky@pecklaw.com
      CHARLES E. FOMBRUN
      Florida Bar No. 105133
      cfombrun@pecklaw.com
      *Attorneys for Skanska USA Civil*
      *Southeast, Inc.*